[No. 55887-6. En Banc. October 31, 1989.]

DEANNA DICOMES, *Appellant,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Peter D. Francis* and *Todd C. Nichols,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Michael Madden, Assistant,* for respondents.

BRACHTENBACH, J.—This case involves the alleged wrongful discharge of appellant–plaintiff, Deanna Dicomes, a state employee. Plaintiff claims that she was discharged in contravention of public policy; that the discharge violated her First Amendment right to freedom of speech, and deprived her of her liberty interest in future employment without due process. She also claims that the discharge constituted outrageous conduct on the part of the state employer. The trial court dismissed these claims on the State's motion for partial summary judgment. We accepted certification of plaintiff's appeal and affirm.

In August 1982, the Director of the Department of Licensing (DOL), appointed plaintiff to the position of

executive secretary to both the Washington Medical Disciplinary Board (MDB) and the Board of Medical Examiners (BME). Where appropriate, the MDB and BME will be collectively referred to as the "Boards." The executive secretary served at the pleasure of the Director of DOL, and the position was exempt from the provisions of Washington's civil service law, RCW 41.06. RCW 18.72.155.

The DOL is responsible for the supervision of business and professions administration. RCW 46.01.055. Among other specific responsibilities, DOL collects an annual disciplinary assessment levied on medical practitioners, RCW 18.72.380, which is deposited in a special medical disciplinary account, RCW 18.72.390; it then submits a budget to the Governor, providing for funding of the disciplinary efforts of the MDB, RCW 43.88.090.

As executive secretary, plaintiff was generally responsible for the organization and supervision of the administrative functions and activities of the Boards. One of her specific responsibilities was forecasting and compiling budget requests. She was also responsible for communicating DOL decisions regarding budget and staffing to the Boards.

In preparation for the 1985 legislative session, plaintiff developed a budget proposal that she presented to her superiors at DOL. Her proposal included the expenditure of surplus funds that had accumulated in the medical disciplinary account. Plaintiff then discovered that DOL's proposed budget[1] did not include expenditure of these surplus funds. It was her opinion that the Boards should know about the availability of surplus funds in account. She approached her superiors at DOL and suggested that if they did not tell the MDB about the surplus, she would do so herself. Her superiors told her that she "didn't want to do that to [her]self." Deposition of Deanna Dicomes, at 67.

Plaintiff released the budget data, including the fact that DOL did not budget the surplus funds, to Dr. Robert Coe,

---

[1] We accept as true Dicomes' claim that she was told this budget was DOL's final recommendation.

chair of the MDB at the time, just prior to the Washington State Medical Association (WSMA) annual meeting. This was in response to a request by Dr. Coe that plaintiff provide budget information to the Boards. Apparently, Dr. Coe and other members of the MDB were generally concerned about funding for medical discipline; but there is no indication that Dr. Coe, or other MDB members, had prior knowledge of the available surplus. Dr. Coe conveyed the budget data to the WSMA in his report on the status of the MDB.

According to the Director, exposing the budget data created a "public uproar" between the medical profession and DOL. The Director felt that plaintiff's actions were intolerable, and he decided to take corrective action. On the recommendation of the assistant director, and within 2 working days of the WSMA annual meeting, DOL conducted a "management study." The management study identified incidents of mismanagement in DOL's medical section, and led to Dicomes' termination.

Plaintiff claims that the management study was a pretext. For purposes of the summary judgment motion, the trial court assumed that plaintiff was discharged because she released information regarding her employer's alleged wrongful or illegal conduct. On appeal, we make the same assumption since the question of whether the discharge was premised on the management study or was in retaliation for exposing budget data would raise issues of fact precluding summary judgment. For purposes of this appeal, defendants accept this assumption without admitting its truth.

This case raises the following issues: (1) whether plaintiff was wrongfully discharged in contravention of a clear mandate of public policy; (2) whether the discharge violated plaintiff's constitutional right to free speech; (3) whether the discharge deprived plaintiff of her liberty interest in future employment without due process; and (4) whether the discharge constituted outrageous conduct.

WRONGFUL DISCHARGE

The general rule in regard to employment contracts indefinite in duration is that either the employer or the employee may terminate the contract at will. *Roberts v. ARCO,* 88 Wn.2d 887, 894, 568 P.2d 764 (1977). In recent years, dissatisfaction with the common law at–will rule has led to the development of several exceptions to its operation. The present appeal deals with application of the "public policy" exception to the at–will doctrine, which was expressly adopted by this court in *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). *See also Krystad v. Lau,* 65 Wn.2d 827, 400 P.2d 72 (1965).

■■ The essence of the public policy exception is that an employee will have "a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." *Thompson,* at 232.

> In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, *courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.*

*Thompson,* at 232 (citing *Parnar v. Americana Hotels, Inc.,* 65 Hawaii 370, 380, 652 P.2d 625 (1982)). In these claims, the employee has the burden to show that the discharge contravened a clear mandate of public policy. *Thompson,* at 232. The question of what constitutes a clear mandate of public policy is one of law. H. Perritt, *Employee Dismissal Law and Practice* § 7.11 (2d ed. 1987); *Cloutier v. Great Atl. & Pac. Tea Co.,* 121 N.H. 915, 926, 436 A.2d 1140 (1981) (Bois, J., dissenting).

A majority of states recognize the public policy exception. *See, e.g., Cummins v. EG&G Sealol, Inc.,* 690 F. Supp. 134, 137–38 (D.R.I. 1988) (collecting cases). The key in these cases is the proper definition of public policy. The

leading case recognizing the public policy exception discussed the meaning of "clearly mandated public policy" and concluded:

> In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. . . . Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

(Citation omitted.) *Palmateer v. International Harvester Co.,* 85 Ill. 2d 124, 130, 421 N.E.2d 876 (1981).

Courts have found contravention of a clear mandate of public policy in four general areas: (1) where the discharge was a result of refusing to commit an illegal act, *see, e.g., Tameny v. ARCO,* 27 Cal. 3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) (termination for refusal to engage in price–fixing); (2) where the discharge resulted due to the employee performing a public duty or obligation, *see, e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (discharge because employee absent from work to serve on jury duty); (3) where the termination resulted because the employee exercised a legal right or privilege, *see, e.g., Kelsay v. Motorola, Inc.,* 74 Ill. 2d 172, 384 N.E.2d 353 (1978) (pursuit of workers' compensation claim); and (4) where the discharge was premised on employee "whistleblowing" activity, *see, e.g., Wagner v. Globe,* 150 Ariz. 82, 722 P.2d 250 (1986).

■ Along with a growing number of jurisdictions, we recognize the public policy found in protecting employees who are discharged in retaliation for reporting employer misconduct, *i.e.,* employee "whistleblowing" activity. *See, e.g., Palmateer v. International Harvester Co., supra; Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980); *Harless v. First Nat'l Bank,* 246 S.E.2d 270 (W. Va. 1978), *cited in Thompson v. St. Regis Paper*

*Co., supra.* In the context of public employment, our Legislature has similarly recognized the importance of encouraging employees to report "improper governmental actions." RCW 42.40.010. Improper governmental action is defined as any action taken by a public official that (1) violates state law, (2) is an abuse of authority, (3) is a substantial and specific danger to the public health or safety, or (4) is a gross waste of public funds. RCW 42.40.020(3).

In determining whether retaliatory discharge for employee whistleblowing activity states a tort claim for wrongful discharge under the public policy exception, courts generally examine the degree of alleged employer wrongdoing, together with the reasonableness of the manner in which the employee reported, or attempted to remedy, the alleged misconduct. *See* 1 L. Larson, *Unjust Dismissal* § 7.02 (1989).

DOL argues that the scope of what constitutes contravention of public policy should be restricted to reports of employer misconduct amounting to clear statutory violations. This approach has found acceptance in several other jurisdictions that recognize wrongful discharge claims premised on whistleblowing activity. *See, e.g., Trought v. Richardson,* 78 N.C. App. 758, 338 S.E.2d 617 (1986) (allegation of violation of state nursing practice act insufficient to qualify for narrow public policy exception); *Petrik v. Monarch Printing Corp.,* 143 Ill. App. 3d 1, 493 N.E.2d 616 (1986) (internal dispute based on alleged employer misconduct regarding chosen accounting methods did not give rise to level of clearly mandated state public policy since it was not the type of dispute that affects citizens collectively); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) (uncovering improper accounting practices did not state cause of action because plaintiff unable to show any violation of state law).

Plaintiff argues that DOL's activity with respect to the medical discipline budget proposal violates the mandate of RCW 18.72.390. She contends that even if the employer's conduct she reported did not technically violate the statute,

that statute embodies a sufficiently clear legislative intent prohibiting the Director's conduct so as to protect her against retaliatory discharge for releasing the budget data to Dr. Coe.

We recognize the need to allow employers to make personnel decisions without fear of incurring civil liability, *Thompson,* at 232, and that restricting these wrongful discharge claims to reports of clear statutory violations surely satisfies that need. However, such a standard is unduly restrictive and does not comport with our examination of the public policy exception in *Thompson,* or with the definition of what constitutes "improper governmental action" in our State's whistleblower statute.

In *Thompson,* we cited with approval the West Virginia Supreme Court's decision in *Harless,* which recognized the need to distinguish between employee conduct motivated by purely private interests, and that conduct motivated by a concern for the welfare of the general public. *Thompson,* at 232. We also stated that in finding a contravention of public policy, courts could look to the letter *or* purpose of a statute. *Thompson,* at 232. And we note that in the whistleblower statute, our Legislature clearly does not restrict reports of improper governmental action solely to clear statutory violations. *See* RCW 42.40.020(3)(a)(ii) and former RCW 42.40.020(3)(b).

Thus, in determining whether a discharge contravenes the public policy of protecting employees who report employer misconduct, we will consider whether the employer's conduct constituted either a violation of the letter or policy of the law, so long as the employee sought to further the public good, and not merely private or proprietary interests, in reporting the alleged wrongdoing.[2] *See Palmateer,* 85 Ill. 2d at 131.

---

[2]We do not decide today whether judicial review of good faith reports of official misconduct, as outlined in RCW 42.40 and reported to the State Auditor, is similarly restricted. This case does not involve a report made pursuant to that statute.

A similar conclusion was reached by the Arizona Supreme Court in *Wagner v. Globe, supra,* where the court stated:

> The relevant inquiry is not limited to whether any particular law or regulation has been violated, although that may be important, but instead emphasizes whether some "important public policy interest embodied in the law" has been furthered by the whistleblowing activity.

*Wagner,* at 89. The court also noted that the Arizona Legislature had recognized that whistleblowing activity is worthy of protection. *Wagner,* at 89; *see* Ariz. Rev. Stat. Ann. § 38–532.

With these principles in mind, we review the statutory scheme implicated by plaintiff's report of DOL's alleged misconduct—RCW 18.72.380–.400. These statutes cover the discipline of medical practitioners and the funding required to implement disciplinary measures. From 1979 to 1983, medical discipline was funded from license renewal fees paid by physicians. *See* former RCW 43.24.085. In 1983, responding to lobbying by the Washington State Medical Association, the Legislature effectively doubled the amount of funds collected from physicians for medical discipline. RCW 18.72.380. This legislation also created a "medical disciplinary account" within the State's general fund, which requires that

> All assessments, fines, and other funds collected or received pursuant to this chapter shall be deposited in the medical disciplinary account and used to administer and implement this chapter.

RCW 18.72.390. The Director of Licensing is required to "allocate all appropriated funds to accomplish the purposes of this chapter." RCW 18.72.400.

Plaintiff argues that this legislative scheme embodies a clear mandate that all funds collected and deposited in the medical disciplinary account *must be used* for medical disciplinary purposes. Plaintiff asserts that when all available funds are not budgeted, they are not being "used" as required by statute. Specifically, she argues that the Director violated the letter and purpose of RCW 18.72.390 by

failing to include in the 1985–87 biennium budget a request for supplemental appropriation of a surplus in the medical disciplinary account that had accumulated during the 1983–85 biennium. Clerk's Papers, at 126. A review of the State's basic budgetary procedures necessitates a contrary conclusion.

Under the state budget and accounting act, RCW 43.88, funds are "appropriated" upon adoption of a budget by the Legislature. RCW 43.88.080. The Governor submits a budget to the Legislature, RCW 43.88.060, which consists of budget proposals compiled by individual agencies, RCW 43.88.090. It is the responsibility of an agency head, such as the Director of Licensing, to formulate a budget, subject to legislative appropriation by adoption of the budget as developed by the Legislature. RCW 43.88.090. Thus, it is generally within the discretion of the agency head and the Governor to determine the scope and extent of budgetary requests.[3]

With this general framework in mind, RCW 18.72.380–.400 should be read as follows: The Director submits a budget to the Governor, who approves and compiles all such requests for presentation to the Legislature. Based on this proposal, the Legislature appropriates certain funds, which the Director is required to allocate toward medical discipline. None of the appropriation may be used for any other purpose, nor may the Director earmark medical disciplinary account funds for any other purpose in a budget proposal. However, there is no requirement in this legislative scheme that the Director commit all available funds in a budget proposal or seek supplemental appropriation.

---

[3]The trial court reached a similar conclusion, but based its decision, in part, on improper grounds. The trial court interpreted language contained in the current version of RCW 18.72.390 (*i.e.*, "*balances* in the medical disciplinary account shall be credited to the general fund.") to evidence a legislative intent that not all funds need be committed in a budget proposal. That language was added by Laws of 1985, ch. 57, § 6, *after* Dicomes' discharge. The trial court noted the possible limitation of this reasoning, and it did not serve as the sole basis for its conclusion that there was no contravention of public policy.

It is important to emphasize the clear legislative intent that it, the Legislature, retained ultimate control over the medical disciplinary account funds. The statute only authorizes the Director to allocate *appropriated* funds to accomplish the purposes of the law. RCW 18.72.400.

It is apparent that the Legislature did not share plaintiff's views regarding the mandate of budgeting the accumulated surplus. Despite a special Senate committee hearing on plaintiff's grievances, see Deposition of Deanna Dicomes, at 139–40, and exhibit 10, the Legislature did not appropriate the accumulated surplus. *See* Laws of 1985, 1st Ex. Sess., ch. 6, § 402, p. 2356 (appropriating $880,000 for medical disciplinary account in 1985–87 biennium); Laws of 1985, ch. 405 (supplemental budget; no appropriation to medical disciplinary account).

In this case, plaintiff reported what she felt constituted a blatant disregard on the part of DOL for statutorily prescribed budgetary action. As discussed, we do not find any violation of state law in the Director's decision not to include the medical disciplinary account's surplus funds in his budget proposal. Nor can we find a clearly articulated legislative intent to abrogate this necessary element of discretion. Moreover, the Director's actions in question constitute neither an abuse of authority, nor a gross waste of public funds. And while plaintiff may argue that budget proposals for medical discipline relate to the public health or safety, we do not accept her claim that the failure to budget surplus funds substantially and specifically endangers it.

Further, by releasing the budget data in the manner Dicomes chose, she compromised the loyalty and confidentiality required of her position as executive secretary, and unnecessarily interfered with the political and discretionary decisionmaking process of her appointed supervisor and ultimately of the Governor. While it appears that plaintiff was not motivated by personal or proprietary interests, the

means she employed to report her employer's alleged misconduct were unreasonable under these circumstances. Providing the budget data to Dr. Coe in disregard of her superior's requests, with the knowledge of the confidential situation at hand, fully expecting that her report would result in dismissal, plaintiff compromised the delicate working relationship between the Boards and DOL. Further, plaintiff was not confronted with the choice of violating the law or sacrificing her job. She was faced with a difference of opinion as to her superior's chosen course of action. In the arena of discretionary political decisionmaking, plaintiff's arguably good faith belief in the righteousness of her conduct is too tenuous a ground upon which to base a claim for wrongful discharge. While we do not restrict such claims solely to incidents of whistleblowing that involve employer statutory violations, we are cognizant of the need to avoid frivolous lawsuits and employer liability when the employee's conduct is merely praiseworthy from a subjective standpoint, or when the public may derive some remote benefit. *See Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 136, 421 N.E.2d 876 (1981) (Ryan, J., dissenting).

We conclude that the facts of this case present no contravention of a clear mandate of public policy under the principles articulated above. Therefore, plaintiff has failed to state a cause of action for wrongful discharge under the public policy exception, and the trial court's dismissal of this claim on summary judgment is affirmed.

## FREE SPEECH

It is well established that a public employee is entitled to reinstatement for a discharge that infringes that employee's constitutionally protected interest in freedom of speech. *Perry v. Sindermann,* 408 U.S. 593, 597–98, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); *Pickering v. Board of Educ.,* 391 U.S. 563, 574, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968). Whether speech is constitutionally protected is a question of law. *Connick v. Myers,* 461 U.S. 138, 148 n.7, 75 L. Ed.

2d 708, 103 S. Ct. 1684 (1983). In *Connick,* the Court outlined a 2–step test for determining the scope of First Amendment rights of public employees. *See Meyer v. UW,* 105 Wn.2d 847, 850–51, 719 P.2d 98 (1986).

■ First, the court must determine whether the speech involves a matter of public concern. *Connick,* at 147–48. Second, the court must balance the interest of the employee as a citizen commenting on matters of public concern with the interest of the State as employer in providing effective and efficient public service. *Connick,* at 150.

DOL concedes that the content of the speech in question bears on a matter of public concern. Even absent this concession, we would find that the *content* of plaintiff's expression, which related to the discipline of the State's medical practitioners, touched upon matters of public import. The key here is that plaintiff was not simply speaking to matters of personal interest, such as disputes over internal office affairs as in *Connick.* She was not disputing her pay, hours, or conditions of employment. Rather, the speech sought "to bring to light actual or potential wrongdoing or breach of public trust . . .". *Connick,* at 148.

■ In addition to the content of the employee's speech, the court must examine its context. *Connick,* at 152–53; *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415 n.4, 58 L. Ed. 2d 619, 99 S. Ct. 693 (1979). Here the focus is on the effective functioning of the public enterprise and the extent to which the employee's speech interferes with or impedes those operations. *Rankin v. McPherson,* 483 U.S. 378, 388, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987). In this context, it is important to examine "the extent of authority and public accountability the employee's role entails." *Rankin,* at 390. If the "employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Rankin,* at 390–91.

Thus, there are limits on the extent to which an employee in a sensitive or policy–making position may

freely criticize superiors and the policies they espouse. This principle is related to the more expansive rules regarding discharge for reasons of political patronage. *See Elrod v. Burns,* 427 U.S. 347, 49 L. Ed. 2d 547, 96 S. Ct. 2673 (1976); *Branti v. Finkel,* 445 U.S. 507, 63 L. Ed. 2d 574, 100 S. Ct. 1287 (1980). While these cases, and their progeny, involve political patronage dismissals, and are therefore factually distinguishable from the case at bar, they identify various factors to be considered in determining whether a speaker is such a policy maker whose First Amendment rights may be restricted by overriding governmental interests. *See generally Juarbe–Angueira v. Arias,* 831 F.2d 11, 13 (1st Cir. 1987) (collecting cases).

In the determination of whether a public employee might be considered a "policy maker" for First Amendment purposes, considerations include whether the speaker establishes priorities, develops programs, procures funding, conducts studies, controls a budget or prepares budget requests, and whether the speaker is given broad discretion and is relatively unsupervised in carrying out these responsibilities. *See Alfaro de Quevedo v. de Jesus Schuck,* 556 F.2d 591, 593 (1st Cir. 1977). A court may also consider whether the speaker's position involves decisionmaking on issues where there is room for political disagreement on goals and their implementation. *See Roman Melendez v. Inclan,* 826 F.2d 130, 133–34 (1st Cir. 1987). Another consideration is whether the statement was made by an appointed executive or high ranking official vested with the authority to carry out discretionary governmental functions, such that the statement challenges the political choices represented by the administration's election to office. *Gonzalez v. Benavides,* 712 F.2d 142, 148 (5th Cir. 1983).

In *Gonzalez,* the Fifth Circuit Court of Appeals cogently summarized the purpose behind limiting protection for policymakers:

> There is a governmental interest in securing those unique relationships between certain high level executives and the elected

officials at whose grace they serve. For this narrow band of relationships, refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself, at least when the appointive job has the sweep of authority and discretion as to be central to the elected official's duty. The holder of such a position can hardly have any reasonable expectation but that his policy choices must publicly fall within the protective license issued by his appointing officer. His selection presumably included that supposition. To say that loss of that job is the price for his public declaration chills little.

*Gonzalez,* at 148.

In sum, a public employee's interest in freedom of speech may be overridden where the State shows a need for political loyalty and confidentiality of its employees who are vested with discretionary authority and policy–making responsibilities.

We note that while plaintiff's status as a policymaker is relevant to this court's assessment of the impact of her speech on the government employer's interest in managing the workplace, that status does not support a blanket exception to First Amendment protection: "The point is simply that the balancing test articulated in *Pickering* [*v. Board of Educ.,* 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1938)] is truly a balancing test, with office disruption or breached confidences being only weights on the scales." *Porter v. Califano,* 592 F.2d 770, 774 (5th Cir. 1979).

In this case, examining the bulk of plaintiff's job responsibilities leads us to conclude that she should be considered a policymaker. The position of executive secretary has broadly defined duties, which include organizing and supervising the administrative functions and activities of the Boards, representing the Boards at state and national meetings, recommending policy and procedural improvements for the Boards, forecasting and compiling budget requests, and establishing administrative policies and procedures to ensure effective implementation of the medical discipline statute. Even Dicomes described herself as the

"CEO" of the Boards, Clerk's Papers, at 106, and categorized her duties as "program management/policy development," Clerk's Papers, at 117.

Another fact that supports our conclusion that plaintiff is a policymaker for First Amendment purposes is that the position of executive secretary is exempted by statute from civil service status. RCW 18.72.155. Exempt positions, absent specific statutory enumeration, are defined as those "involving substantial responsibility for the formulation of basic agency or executive policy . . ." RCW 41.06.070(27).

While it may be argued that plaintiff did not actually formulate policy, her position as executive secretary involved substantial discretion and autonomy, and she was clearly involved in the development and communication of policy.

It is equally important to consider the fact that her speech might have a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary . . ." *Rankin,* at 388. Further, plaintiff's vital role as a public spokesperson for the Boards shows a high degree of public contact and accountability; thus, her speech relating to the Board's activities could significantly impact or impede the effective functioning of the public enterprise.

In sum, we hold that the Director's interest in providing an effective and efficient public service, and in maintaining a close working relationship with his appointed executive secretary, outweighs plaintiff's interest in speaking out on matters of discretionary budgetary decisionmaking, even though that speech may relate to matters of public concern. Plaintiff occupied a position involving the development of policy and requiring a high degree of discretion and autonomy. Her position was also one in which personal loyalty and confidentiality were necessary elements. The First Amendment "does not require that [the Director] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Connick,* at 154. Thus, no First Amendment

rights were violated by the discharge, and the trial court's summary dismissal of this claim is affirmed.

## LIBERTY INTEREST/DUE PROCESS

■ Plaintiff argues that her discharge deprived her of a liberty interest in future employment without due process. In this context, a liberty interest is infringed if (1) "the government dismisses an employee based on a charge that calls into question his good name, honor or integrity", or (2) "if the government imposes a stigma or other disability that forecloses the employee's freedom to take advantage of other employment opportunities." *Giles v. Department of Social & Health Servs.*, 90 Wn.2d 457, 461, 583 P.2d 1213 (1978), *cited in Ritter v. Board of Comm'rs*, 96 Wn.2d 503, 510, 637 P.2d 940 (1981).

Plaintiff argues that her loyalty was called into question thus implicating her good name, honor, or integrity. This claim is unpersuasive. The only evidence of any mention of disloyalty is found in respondents' declarations in support of summary judgment, and in internal discussions of Dicomes' job performance, neither of which can supply support for her claim. *Bishop v. Wood*, 426 U.S. 341, 348, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976). Further, DOL's statements regarding Dicomes' inefficiency, which are supported by the record, do not implicate integrity or honor. *Giles*, at 461.

Finally, the DOL has not taken any affirmative steps to foreclose Dicomes' opportunity to seek employment elsewhere. *See State ex rel. Swartout v. Civil Serv. Comm'n*, 25 Wn. App. 174, 184, 605 P.2d 796, *review denied*, 93 Wn.2d 1021, *cert. denied*, 449 U.S. 992 (1980). Her employment opportunities may have been diminished, but not foreclosed, *see Ritter*, at 510, as evidenced by her subsequent employment as executive secretary of the South King County Multi–Service Center.

Therefore, Dicomes' liberty interest in future employment was not infringed by the discharge, and the trial court is affirmed.

## TORT OF OUTRAGE

The basic elements of the tort of outrage are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich,* 109 Wn.2d 48, 61, 742 P.2d 1230 (1987); Restatement (Second) of Torts § 46 (1965). The conduct in question must be "*so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*" *Grimsby v. Samson,* 85 Wn.2d 52, 59, 530 P.2d 291 (1975). The question of whether certain conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability. *Phillips v. Hardwick,* 29 Wn. App. 382, 387, 628 P.2d 506 (1981).

Plaintiff argues that her discharge constituted outrageous conduct because it allegedly showed her to be an incompetent and disloyal employee. She argues that the management study was "an intentionally prepared false report created for the sole purpose of embarrassing, humiliating and then terminating Ms. Dicomes . . .". Reply Brief of Appellant, at 30. She asserts that if this allegation is true, it would constitute outrageous conduct. We disagree.

First, even if the purpose of the study was to fire plaintiff, the fact of the discharge itself is not sufficient to support a claim of outrage. *Evrard v. Jacobson,* 117 Wis. 2d 69, 342 N.W.2d 788 (Ct. App. 1983). It is the manner in which a discharge is accomplished that might constitute outrageous conduct. Here DOL discharged plaintiff by privately delivering a termination letter, and briefly *responding* to media inquiries regarding the dismissal. This cannot be considered atrocious and intolerable in a civilized society.

Second, mere insults and indignities, such as causing embarrassment or humiliation, will not support imposition of liability on a claim of outrage. Restatement (Second) of Torts § 46, comment *d* (1965); *Grimsby,* at 59.

At worst, plaintiff's allegations amount to a showing of bad faith. And even if they rose to the level of malice, which the trial court determined they did not, no claim of outrage could be stated. *See* Restatement (Second) of Torts § 46, comment *d* (1965).

Dicomes has the burden of proof on this claim of outrageous conduct, and as the nonmoving party on summary judgment, she cannot rest on the mere allegations of her pleadings; she must set forth specific facts showing that there is a genuine issue of material fact. CR 56(e); *Meyer v. UW,* 105 Wn.2d 847, 852, 719 P.2d 98 (1986). She has failed to do so, and the trial court's dismissal of this alternative theory of liability is affirmed.

Based on the foregoing analysis, we affirm the judgment below. DOL requested an award of costs and attorney fees on appeal in its brief, but has not filed an affidavit of fees and expenses and, therefore, has failed to fully comply with RAP 18.1.

CALLOW, C.J., UTTER, DOLLIVER, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., and HAMILTON, J. Pro Tem., concur.