87 F.3d 1320
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Jagdish C. LAUL, Plaintiff-Appellant,
v.
BATTELLE MEMORIAL INSTITUTE, a non-profit organization,
Defendant-Appellee.
 No. 95-35156.
 United States Court of Appeals, Ninth Circuit.
 Argued April 11, 1996.
Submission Deferred April 11, 1996.
Resubmitted April 30.
Decided June 14, 1996.
 
 Before: WRIGHT, PREGERSON, and TASHIMA, Circuit Judges.
 ORDER
 This case is hereby resubmitted effective April 30, 1996.
 Before: WRIGHT, PREGERSON, and TASHIMA, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Plaintiff-Appellant Jagdish C. Laul ("Dr. Laul") appeals the district court's grant of summary judgment in favor of Defendant-Appellee Battelle Memorial Institute ("Battelle"). Dr. Laul alleges breach of employment contract, wrongful discharge in violation of Washington public policy because of his whistleblowing activities, and unlawful discharge from employment because of his race in violation of Washington Law Against Discrimination, Wash.Rev.Code § 49.60.180. Battelle alleges it fired Dr. Laul after he disposed of hazardous materials from his laboratory in an improper manner. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse in part.
 
 ANALYSIS
 
 3
 A grant of summary judgment is reviewed de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 116 S.Ct. 1261 (1996). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id. In this diversity action, Dr. Laul's claims are governed by Washington law. See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938) (in diversity cases, federal courts must apply state rather than federal substantive laws).
 
 A. Breach of Contract
 
 4
 Dr. Laul claims that there was evidence of an employment contract and that Battelle breached this contract. We reject this claim.
 
 
 5
 No formalized agreement concerning Dr. Laul's employment relationship with Battelle exists; Dr. Laul bases his contract claim on Battelle's Disciplinary Action Policy. Under Washington law, an employment contract, indefinite as to duration, is generally terminable at will by either employee or employer. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 223, 685 P.2d 1081, 1084 (1984). The Washington Supreme Court has held that "absent specific contractual agreement to the contrary, we conclude that [an] employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship." Id. at 229, 685 P.2d at 1087. The court explained that, "if an employer ... creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." Id. at 230, 685 P.2d at 1088. Employers, however, will not be bound by statements in employment manuals if they "specifically state, in a conspicuous manner that nothing contained therein is intended to be part of the employment relationship and are simply general statements of company policy." Id.
 
 
 6
 Although Battelle's Disciplinary Action Policy appears to promise "specific treatment in specific situations," the Policy states in its first paragraph that it is not "to be construed as limiting Battelle's right to terminate without cause." This reservation of rights by Battelle is both specific and conspicuous. Thompson, 102 Wash.2d. at 230, 685 P.2d at 1088. Thus, the Disciplinary Action Policy should not lead to any "obligations that govern the employment relationship." Id. at 229, 685 P.2d at 1087. Dr. Laul is therefore an at will employee.
 
 
 7
 Because Battelle's Disciplinary Action Policy did not alter Dr. Laul's at will status and Dr. Laul presented no other evidence of an employment contract, the district court was correct in finding Dr. Laul an at will employee and dismissing his breach of contract claim.
 
 B. Whistleblowing
 
 8
 Dr. Laul claims that he falls within the "public policy" exception to Washington's at will employment rule. To state a claim for wrongful discharge in violation of public policy, the employee "must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened." Thompson, 102 Wash.2d at 232, 685 P.2d at 1089. Washington courts have recognized a public policy "in protecting employees who are discharged in retaliation for reporting employer misconduct, i.e. 'whistleblowing' activity." Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002, 1007 (1989). In a claim for wrongful termination for whistleblowing, "[t]he relevant inquiry is not limited to whether any particular law or regulation has been violated [by the employer], although that may be important, but instead emphasizes whether some 'important public policy interest embodied in the law has been furthered by the whistleblowing activity.' " Id. at 621, 782 P.2d at 1008 (citations omitted).
 
 
 9
 Dr. Laul claims that he was terminated in retaliation for his disclosures to the Department of Energy ("DOE") regarding Battelle's alleged violations of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, in its use of the spectrometer. Between April 26, 1989 and May 1990, Dr. Laul made numerous complaints to Battelle and DOE officials alleging misuse of the spectrometer and Nuclear Waste Fund money. According to Dr. Laul, on four separate occasions between the fall of 1989 and his termination in May 1990, Dr. Kaiser specifically threatened Dr. Laul with termination in response to Dr. Laul's contact with the DOE.
 
 
 10
 To state a claim for wrongful termination, Dr. Laul must establish Battelle's wrongful intent to discharge in contravention of public policy. Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 177, 876 P.2d 435, 445 (1994) (emphasis added). Dr. Laul presents a genuine issue of material fact whether Battelle had the wrongful intent to discharge him for his whistleblowing. He presented evidence of Dr. Kaiser's threats of termination for Dr. Laul's complaints to the DOE. Dr. Laul also presented evidence that Dr. Kaiser drafted a memorandum on May 10, 1995, specifically calling for Dr. Laul's termination for complaining to the DOE about Battelle's alleged wrongful use of the spectrometer.
 
 
 11
 Battelle claims that its use of the spectrometer and Nuclear Waste Fund money was not in violation of the NWPA. Battelle further claims that because it broke no laws in its use of the spectrometer, Dr. Laul cannot be considered a whistleblower. Dr. Laul's complaints, however, apparently triggered DOE action against Battelle, including a letter to the Director of Pacific Labs and an investigation into Battelle's accounting procedures.
 
 
 12
 A DOE letter dated November 15, 1989 was sent to the Director of Pacific Labs to provide the laboratory with guidance regarding the use of equipment purchased with Office of Civilian Radioactive Waste Management ("OCRWM") funds.[1] The DOE letter states that "[this equipment] must remain available for use by all OCRWM participants" and "[Pacific Labs] must ... be able to demonstrate that OCRWM work always has first priority on the subject equipment."
 
 
 13
 Dr. Laul claims that his complaints to the DOE and its Inspector General led to a DOE investigation into Battelle's use of the spectrometer. Furthermore, Dr. Laul states that this investigation led to Battelle's reimbursement of over $100,000 to the DOE for Battelle's private, nongovernmental use of the spectrometer. Battelle responds that, although there were several DOE inquiries related to Dr. Laul's allegations, there has "never been a finding that Battelle acted illegally in any way." Battelle notes that there may have been some errors regarding the accounting for non-OCRWM use of the spectrometer, but these errors were rectified to the DOE's satisfaction. Dr. Laul, however, states that these adjustments were not made until the Inspector General began to investigate Battelle's use of the spectrometer pursuant to Dr. Laul's allegations and that there is no evidence that the government's investigation has been completed.
 
 
 14
 We agree that Battelle's reimbursement to the DOE could have resulted from Dr. Laul's disclosure of Battelle's improper use of the spectrometer. In light of Battelle's reimbursement to the DOE and the above DOE inquiries and statements regarding Battelle's use of the spectrometer, it appears Battelle may have violated the NWPA. "Basically, [the NWPA] prohibits any tapping into [the DOE's discretionary laboratory research funds] for other than the objectives of establishing a nuclear waste and disposal repository and related activities." Review of the Department of Energy's Discretionary Laboratory Research Funds: Hearing Before the Environment, Energy, and Natural Resources Subcomm. of the House Comm. On Government Operations, 102d Cong., 1st Sess. 1, 129 (1991) (testimony of Victor S. Rezendes, the GAO Director of Energy Issues). Because the spectrometer was purchased with NWPA funds, Battelle must reimburse the government for its private use of the spectrometer. Any failure by Battelle to reimburse the government for private use of the spectrometer would therefore amount to tapping into DOE funds for objectives other than establishing a nuclear waste and disposal repository. If Battelle did violate the NWPA, the "important public interest" embodied in the law that Nuclear Waste Fund money should not be used for private industry research was furthered by Dr. Laul's disclosures. In light of the above, there remains a genuine issue of material fact whether Dr. Laul may be considered a whistleblower.
 
 
 15
 Battelle also claims that Dr. Kaiser did not take part in the decision to discharge Dr. Laul and that Dr. Laity's decision was based only on Dr. Laul's improper disposal of hazardous waste. There is evidence in the record, however, that Dr. Laity made the decision to terminate Dr. Laul within a few days after the DOE contacted Dr. Laity regarding Dr. Laul's complaints about Battelle's use of the spectrometer. Furthermore, Dr. Laity terminated Dr. Laul only five days after Dr. Kaiser drafted a memorandum calling for Dr. Laul's termination because of his contact with the DOE.[2]
 
 
 16
 In sum, Dr. Laul raises a genuine issue of material fact whether he was terminated in violation of public policy. He presented evidence that: (1) after Dr. Laul contacted the DOE, the DOE informed Battelle that it must be able to demonstrate that OCRWM work always has first priority on the spectrometer; (2) after Dr. Laul contacted the DOE and its Inspector General, the DOE investigated Battelle's use of NWPA funds and required Battelle to reimburse the DOE more than $100,000; and (3) Dr. Laul's immediate supervisor drafted a memorandum only five days before Dr. Laul's termination calling for Dr. Laul's termination because of his complaints to the DOE. We therefore reverse the district court's dismissal of Dr. Laul's whistleblowing claim.
 
 C. Race Discrimination
 
 17
 Battelle claims that Dr. Laul has offered no evidence in support of his racial discrimination claim. The record, however, includes a declaration of a former Battelle employee, Joseph Schmitt, alleging that Dr. Kaiser bore racial animosity towards Dr. Laul. Dr. Kaiser told Schmitt that "he had trouble dealing with Indians and that he just did not like J.C. Laul." Dr. Kaiser also allegedly said that "he tried his best to get along with Dr. Laul but he did not get along with people of his race." Furthermore, despite fourteen years of employment with Battelle, Dr. Laul was terminated less than one year after Dr. Kaiser became his supervisor.
 
 
 18
 Battelle claims that Dr. Laity made the decision to discharge Dr. Laul based on the events surrounding Dr. Laul's improper disposal of hazardous waste and that Dr. Laul's race played no part in that decision. "When a plaintiff ... seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a factfinder." Lowe v. City of Monrovia, 775 F.2d 998, 1009 (9th Cir.1986).
 
 
 19
 In the present case, the district court stated that Dr. Kaiser's comment regarding Indians "sort of stands alone." It appears that the district court was characterizing Dr. Kaiser's remark as a "stray remark." See Merrick v. Farmer's Ins. Group, 892 F.2d 1434, 1438 (9th Cir.1990) (holding that stray remark by decisionmaker referring to youth of employee promoted instead of age discrimination plaintiff was insufficient to prove the employer relied on illegitimate age-related criteria). Because Dr. Kaiser was Dr. Laul's direct supervisor and because the remark was directed specifically at Dr. Laul, Dr. Kaiser's remark should be considered more than simply a stray remark and should not be dismissed as simply "standing by itself."
 
 
 20
 Where "the evidence creates 'reasonable but competing inferences of both discrimination and nondiscrimination,' a factual question for the jury exists." Johnson, 80 Wash.App. at 229, 907 P.2d at 1233 (citation omitted). Although the evidence that Dr. Laul was fired because of his improper disposal of hazardous waste may create a reasonable inference of nondiscrimination, Dr. Kaiser's remarks about Indians and his dislike of Dr. Laul because of Dr. Laul's race conversely creates a reasonable inference of discrimination. Thus, it appears that a factual question for the jury exists.
 
 
 21
 In light of the above, the district's court's conclusion that "the real reason for the termination was for Dr. Laul's own conduct" was improper at the summary judgment stage. Dr. Laul's race discrimination claim should not have been dismissed on summary judgment.
 
 CONCLUSION
 
 22
 We affirm the district court's grant of summary judgment in favor of Battelle on the breach of contract claim. We reverse and remand the district court's grant of summary judgment in favor of Battelle on the whistleblowing and race discrimination claims because there exist genuine issues of material fact.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The OCRWM was created by the NWPA. Furthermore, OCRWM funds enabled the purchase of the spectrometer and the funding of Dr. Laul's projects
 
 
 [2]
 Battelle's counsel conceded at oral argument that Dr. Kaiser had in fact drafted such a memorandum