James M. BLACKFORD, Plaintiff,

v.

BATTELLE MEMORIAL INSTITUTE,
Defendant.

No. CS–98–032–FVS.

United States District Court,
E.D. Washington.

April 23, 1999.

Steven Craig Lacy, Lacy & Kane PS, East Wenatchee, WA, for plaintiff.

Stuart R. Dunwoody, Davis Wright Tremaine, Seattle, WA, Jin H. Kim, Davis Wright Tremaine, Bellevue, WA, for defendant.

---

## ORDER

VAN SICKLE, District Judge.

**THIS MATTER** came before the Court on April 16, 1999, based upon the defendant's motion for summary judgment. The plaintiff was represented by Steven C. Lacy; the defendant by Stuart R. Dunwoody.

## SUMMARY

On August 10, 1992, James M. Blackford began working for Battelle Memorial Institute at its Pacific Northwest National Laboratory in Richland, Washington. The Pacific Northwest National Laboratory ("PNNL") is in the business of performing research. PNNL scientists and engineers perform some research projects for Battelle. They perform other research projects for clients. The Department of Energy is one of PNNL's clients.

Mr. Blackford was classified as a "Scientist & Engineer III." As such, he was expected to find research projects on which to work. Each hour he spent working on a project was billed to the project. Time he could not bill to a project was charged as "idle time."

On June 23, 1997, Mr. Blackford was fired. He says he was discharged in retaliation for his opposition to discrimination and mismanagement. Battelle says he was fired because he failed to perform enough billable research.

## JURISDICTION

Mr. Blackford filed a complaint in state court alleging that his discharge violated both RCW 49.60.210[1] and public policy. Battelle removed the matter to federal court based upon diversity of citizenship. 28 U.S.C. § 1332(a). The Court has jurisdiction over the subject matter and parties of this action.

## BACKGROUND

Mr. Blackford was hired by Ms. Lee Ann Dudney. As Blackford concedes, he antagonized a member of the Human Resources staff on his first day on the job. The next day, Ms. Lee Ann Dudney, the hiring manager, reported a comment to her from the H/R staff member responsible for the error that I " *'was difficult to work with and uncooperative.'* " (Memo-

---

1. That statute provides in pertinent part, "It is an unfair practice for any employer ... to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter[.]"

randum of February 22, 1995, at 14.) (Emphasis in original.)

During October of 1992, Mr. Blackford participated in a series of meeting with coworkers. He learned that one of his fellow employees had criticized him for " '*pursuing his own agenda*' ...." *Id.* at 15. (Emphasis in original.)

During April of 1993, Mr. Blackford attempted to review certain lease and maintenance charges. Because of inadequate record keeping, he was unable to complete the task. He recommended that a detailed audit be conducted, but his recommendation was rejected. *Id.* at 16–17.

On May 15, 1993, Mr. Blackford's manager, Mr. Robert Mahan, assigned him to a new position. Blackford believes the reassignment was connected to his report concerning the lease and maintenance charges. *Id.* at 17.

During August of 1993, one of Mr. Blackford's coworkers, Dave McGee, offered to copy an article from BYTE magazine and distribute it. Blackford objected. That prompted a flurry of e-mail. One of the messages stated in part:

> Dave offered to make copies of the article for interested parties. J. Michael, in his usually tactful manner, sent a response stating that making copies of articles is illegal and unethical and copied his response to the members of the team that are working on the IS & S code of ethics (hence, my involvement in this). JMB's message wreaked [sic] of a "I have a lot of experience in this area and you are unfit to be on this team" attitude.

(E-mail from Michael D. Bettinson dated August 2, 1993.)

During November of 1993, Mr. Mahan began compiling a file concerning Mr. Blackford in anticipation that he might be fired. During his deposition, Mahan explained, "[B]y this time it was very clear to me that Michael had alienated a great number of people and that I had better at least try to put what information I had in some kind of order, and that's what I did." (Deposition of Robert Mahan at 79.) During roughly the same period of time, Mr. Blackford began working for Jan E. Goolsbey, the manager of the Production Systems Department.

On February 16, 1995, Mr. Blackford received a written evaluation from Goolsbey. (Declaration of James M. Blackford, Appendix "D.") The evaluation was sharply critical. In essence, Goolsbey told Blackford he needed to improve both his communication skills and productivity. Goolsbey instructed Blackford to develop a "corrective action plan" to remedy the problems cited in the evaluation. *Id.*

On February 21, 1995, Mr. Blackford wrote to Congressman Richard N. Hastings complaining that Goolsbey's evaluation was a form of retaliation. He said:

> I fear and am reasonably certain that this is in retribution
>
> ● for my efforts in support of EEO/AA at the lab and in the IS & S directorate,
>
> ● for my identification of an impending act of copyright infringement,
>
> ● for pointing out a lack of management controls which probably resulted in a significant waste of federal funds,
>
> ● for identifying possible misrepresentations to DOE,
>
> and for other events of a similar nature that have taken place in the last 2½ years.

Mr. Blackford expanded upon his letter in a memorandum dated February 22, 1995.[2] Interpreting the letter in light of the memorandum, it appears that Blackford's comment about "my support of EEO/AA" is a reference to his efforts to support diversity programs. His comment about "my identification of an impending act of copyright infringement" is a reference to his objection to Dave McGee's offer to photocopy

---

2. This is the memorandum cited above.

the magazine article. Finally, his comments about a "lack of management controls" and "possible misrepresentations to DOE" are references to his 1993 report concerning lease and maintenance charges.

Mr. Blackford's memorandum of February 22, 1995, strongly implied that PNNL was discriminating against women and minorities. He said, "I seem to be latest in a series of victims, predominantly women and minorities—scapegoats to the dysfunctionality [sic] of the organization—those who're punished because they refused or were unable to compromise their personal, cultural, or professional integrity." (Memorandum of February 22, 1995, at 4.) In a footnote, Blackford alleged, "In a recent nine-month period in IS & S, the number of females and minorities terminating their employment at PNL was proportionally 52% greater, and 143% greater respectively than white males." *Id.* at 4 n. 3.

Shortly after lodging the complaints described above, Mr. Blackford met with Mr. Goolsbey and other Battelle managers. Apparently, the meeting ended on a hostile note. As a result, Blackford was instructed to meet with a Battelle psychologist, who pronounced him fit for work.

On June 27, 1995, Mr. Blackford was assigned to a new manager, Mr. Earl W. Heister. Blackford and Heister were, in turn, supervised by Mr. Gerald Work.

Mr. Heister provided Blackford with a written list of expectations. Among other things, Heister wrote, "The two basic areas where improved performance is required are interpersonal skills and performance on projects." (Memorandum of June 27, 1995, at 1.)

On December 16, 1995, Mr. Blackford received an evaluation from Heister. Blackford was congratulated for making significant progress, and given an "Overall Rating" of "Very Good." Nevertheless, he was admonished to keep working on communication and productivity.

During April of 1996, a project manager named James A. Wise asked Heister to use training funds to help finance Blackford's participation in a project. Heister advised Wise that the funds in question could not be used for the proposed purpose. At about the same time, PNNL removed Wise from the project. In an e-mail to Heister dated April 28, 1996, Wise attributed PNNL's decision to remove him from the project to machinations on the part of Richard Chidester. In addition, Wise told Heister, "When I informed Rich [Chidester] on Tuesday that I was attempting to arrange funding with Mike [Blackford] to bring him on the SPIRE project with the assistance of your training funds, Rich was very negative and said (and this is quotes in my notes) 'Why didn't you ask me first? We don't want him here. He's a troublemaker'."

As Fiscal Year 1996 came to a close and Fiscal Year 1997 began, Blackford was charging increasing percentages of his time to idle time. Between October 1, 1996, and December 31, 1996, Blackford charged 60% of his time to idle time.

On January 20, 1997, Blackford received two documents from Heister. One was an evaluation. The other was a list of Heister's expectations. Heister gave Blackford credit for his contributions to PNNL research, but advised him in no uncertain terms that he had to improve productivity. "If," said Heister, "you are not able to become fully funded, on project work, within 60 days and are not able to sustain fully funded project commitments, action up to and including possible termination of your employment will be considered." (Memorandum from Heister to Blackford dated January 20, 1997.)

Between February and April of 1997, Blackford was "responsible for assembling the financial budget forecast for the Information Resource Management (IRM) portion of the Laboratory's response to DOE's 1999 Field Budget Call." (Memorandum of August 12, 1997, at 314.) Apparently, this forecast is referred to as " 'the UniCall.' " *Id.* at 314 n. 12. After reviewing the numbers he had been given,

Blackford concluded they were inaccurate. *Id.* at 315. Late in April or early in May of 1997, he reported his conclusions to Robert Mahan, Lee Ann Dudney, and Maureen Gilmore. According to Blackford, nothing was done to correct the error. *Id.*

On May 12, 1997, Heister sent Blackford a memo indicating he was insufficiently productive. Heister stated:

Last week you charged 23 hours to idle time. We do not have the TMC funding to support any time as idle time.

Therefore, this presents an untenable situation. I will begin working with our Human Resources Manager to see what options are available.

According to Heister, Blackford's productivity did not improve during the next few weeks. Consequently, Heister recommended to Mr. Work that Blackford be discharged. Mr. Work accepted Heister's recommendation and discharged Blackford on June 23, 1997.

On August 12, 1997, Blackford prepared a second lengthy memorandum. Like his first memo, it summarized his grievances against PNNL.

On September 4, 1997, Mr. Darren Curtis posted an e-mail at PNNL which drew several responses, one of which was from Dwight Hughes. A copy of the exchange was provided to Blackford by a friend. One of the messages stated in part:

Sometimes things can be over analyzed and actually cost more than the perceived waste. For instance, there have been cases in the past, where staff have spent 8 hours a day posting messages, talking about their perception of problems in the hall (keeping others from their work), and complaining about never having enough funding to get their work done. Some of these people no longer work at PNNL now that it only takes two years of record keeping (and not an act of Congress) to fire them. The cost of firing a person like this amounts to two years direct charges to clients (or overhead), their manager(s) lost time, project deliverables slipping, and all the other PNNL staff who wasted their time engaging in idle chit-chat. For an S & E III this amounts to $500K.

This is not aimed at Dwight but is mainly aimed at one individual that no longer works at PNNL (thank goodness). The point is that you can waste more money talking about the problem and trying to fix it then the original problem cost you.

(Declaration of James M. Blackford, Appendix "H.") Blackford believes that he is the person to whom Curtis was alluding. According to Blackford, Curtis is a friend of Heister's.

### RCW 49.60.210

■ The State of Washington does not bar all forms of retaliation in the workplace. Rather, RCW 49.60.210(1) makes "[i]t is an unfair practice for any employer ... to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter...." Thus, to establish a violation of that statute, Blackford must prove three things: One, he opposed a practice that is forbidden by Washington's law against discrimination. *See Wilmot v. Kaiser Aluminum and Chemical Corp.*, 118 Wash.2d 46, 68, 821 P.2d 18 (1991). Two, he was discharged. *Id.* Three, retaliation was a substantial factor motivating the discharge. *Allison v. Housing Authority of the City of Seattle*, 118 Wash.2d 79, 96, 821 P.2d 34 (1991).

■ To establish a prima facie violation of RCW 49.60.210, Blackford must first offer evidence indicating that Battelle arguably discriminated against someone in violation of Washington's law against discrimination. *See Kahn v. Salerno*, 90 Wash.App. 110, 130, 951 P.2d 321 (1998) ("Kahn need not prove that her complaints were to behavior that would violate the law against discrimination; but her opposition must be to conduct that is at least arguably a violation of the law."). Blackford

has failed to produce admissible evidence that Battelle committed arguable acts of discrimination. Granted, Blackford suggested in his memorandum of February 22, 1995, that Battelle was discriminating against women and minorities. Significantly, however, no member of a protected class supported that allegation. The only evidence Blackford could offer was this, "In a recent nine-month period in IS & S, the number of females and minorities terminating their employment at PNL was proportionally 52% greater, and 143% greater respectively than white males." (Memorandum of February 22, 1995, at 4 n. 3.) While there are instances in which statistical evidence may demonstrate the existence of discrimination, *Shannon v. Pay 'N Save Corp.*, 104 Wash.2d 722, 709 P.2d 799 (1985), the comparison Blackford performed does not constitute admissible statistical evidence. Thus, there is no evidence from which a jury could find that Battelle arguably discriminated against its employees on the basis of sex or race.

 Even if Blackford had identified arguable acts of discrimination, he would still have to offer evidence indicating that his opposition to an unlawful employment practice was a substantial factor in Gerald Work's decision to discharge him. *Allison*, 118 Wash.2d at 96, 821 P.2d 34. To satisfy that burden, he would have to produce evidence from which a jury could find that Mr. Work knew he was engaged in conduct protected by RCW 49.60.210. Again, Blackford offers no such evidence. The only thing that comes close is the e-mail from Darren Curtis. However, there are several problems with Blackford's reliance on Curtis' e-mail. It is by no means clear Curtis was referring to Blackford, and, even though Curtis and Heister are friends, it is by no means clear Curtis' views are shared by either Heister or Work. Moreover, there is no reference in the e-mail to protected activity. Thus, even if a jury could find that the e-mail reflects Heister's (and perhaps Work's) attitude toward Blackford, there is nothing

in the e-mail indicating Heister and Work were aware of, much less concerned about, protected activity.

## PUBLIC POLICY

 Under the common law of the State of Washington, an employer may "discharge an employee with or without cause, absent an agreement to the contrary." *Reninger v. State of Washington Department of Corrections*, 134 Wash.2d 437, 445–46, 951 P.2d 782 (1998) (citations omitted). However, there are exceptions to the terminable-at-will rule. *See id.* For example, in *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 232, 685 P.2d 1081 (1984), the Washington Supreme Court held that a discharged employee may bring "a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." To establish a tortious discharge in violation of public policy, Blackford must prove four elements: (1) "the existence of a clear public policy (the *clarity* element)"; (2) "that discouraging the conduct in which [he] was engaged would jeopardize the public policy (the *jeopardy* element)"; "that the public-policy-linked conduct caused the dismissal (the *causation* element)"; and (4) Battelle cannot "offer an overriding justification for the dismissal (the *absence of justification* element)." *Gardner v. Loomis Armored, Inc.*, 128 Wash.2d 931, 941, 913 P.2d 377 (1996).

 Blackford bears the burden of showing that his discharge violated "a clear mandate of public policy." *Dicomes v. State of Washington*, 113 Wash.2d 612, 617, 782 P.2d 1002 (1989). "The question of what constitutes a clear mandate of public policy is one of law." *Id.* "Courts must 'find' not 'create' public policy, and the existence of such public policy must be 'clear.'" *Selix v. Boeing Co.*, 82 Wash.App. 736, 741, 919 P.2d 620 (1996) (citations omitted). Courts are to "proceed cautiously if called upon to declare public policy absent some prior legislative or judicial

expression on the subject." *Thompson,* 102 Wash.2d at 232, 685 P.2d 1081.

Blackford does not identify a legislatively or judicially approved policy. Instead, he relies upon 10 C.F.R. § 708,[3] which is being amended by the Department of Energy. 64 Fed.Reg. 12862 (1999).[4] In particular, he cites former § 708.3 and former § 708.5.

Former § 708.3 contained language that supports Blackford's position. It stated:

> It is the policy of DOE that employees of contractors at DOE facilities should be able to provide information to DOE, to Congress, or to their contractors concerning violations of law, danger to health and safety, or matters involving mismanagement, gross waste of funds, or abuse of authority, . . . .

(Emphasis added.) Moreover, former § 708.5 prohibited retaliation for certain protected activities.[5] Nevertheless, it is questionable whether former sections 708.3 and 708.5 constitute clear public policy within the meaning of *Thompson.* . First, former § 708 was not a regulation of general applicability. Rather, it created contractual rights for the employees of DOE contractors in certain situations. Second, it appears to have been intended as a dispute-resolution mechanism, not a freestanding prohibition against retaliation in the workplace. Third, the dispute-resolution mechanism provided by § 708 was not available to employees who pursued remedies under state law. 10 C.F.R. § 708.6(a). Finally, the scope of former § 708 was ambiguous. The amendments attempt to eliminate the ambiguity by providing that the relevant sections "afford protection for disclosures of 'substantial' violations of laws, rules or regulations and 'gross' mismanagement, instead of 'violations of laws, rules or regulations' and 'mismanagement.'" 64 Fed.Reg. 12862, 12863.

■ There is another problem with this claim. Even if former § 708 constitutes clear public policy, Blackford must present evidence that his participation in protected conduct caused his discharge. *Gardner,* 128 Wash.2d at 941, 913 P.2d 377. He has failed to do so. The record indicates Blackford's complaints of mismanagement were made to persons other than Heister and Work. As noted above, there is no evidence Heister and Work knew about (much less cared about) Blackford's allegedly protected conduct.

## JUSTIFICATION/PRETEXT

■ If Blackford has made prima facie showings with respect to either his statutory retaliation claim or his tort claim, the burden shifts to Battelle to justify its decision to terminate him. *Wilmot,* 118 Wash.2d at 70, 821 P.2d 18. Battelle has offered a legitimate explanation: Blackford was insufficiently productive. Consequently, the burden shifts back to Black-

---

**3.** Battelle discussed a number of statutes in its memorandum in support of summary judgment. In his response, Blackford mentioned only former § 708. By failing to respond to Battelle's discussion of the various statutes, Blackford abandoned reliance upon them.

**4.** The interim final rule became effective on April 14, 1999. Battelle first cited the amendments at oral argument on April 16, 1999. Neither party asked to brief the retroactivity of the amendments. For purposes of Battelle's motion for summary judgment, the Court assumes the amendments are not retroactive.

**5.** It stated in pertinent part:
(a) A DOE contractor covered by this part may not discharge or in any manner demote, reduce in pay, coerce, restrain, threaten, intimidate, or otherwise discriminate against any employee because the employee (or any person acting pursuant to a request of the employee) has—
(1) Disclosed to an official of DOE, to a member of Congress, or to the contractor (including any higher tier contractor), information that the employee in good faith believes evidences—
(i) A violation of any law, rule, or regulation;
(ii) A substantial and specific danger to employees or public health or safety; or
(iii) Fraud, mismanagement, gross waste of funds, or abuse of authority; . . . .

ford to present evidence from which a jury could find that Battelle's justification is a pretext for discrimination. *See id.*

Blackford's response is that Battelle managers engaged in a two-year conspiracy to sabotage his efforts to find projects in which to participate. While Blackford's theory is ingenious, there is no credible evidence to support it. All he has succeeded in proving is that a significant number of his coworkers disliked him.

In fact, Blackford had at least three managers during his tenure at PNNL—Mahan, Goolsbey, and Heister. All three were critical of his performance. Moreover, beginning in February of 1995 and continuing through May of 1997, he was warned repeatedly about his lack of productivity. Indeed, Heister suggested several steps to improve performance. Nothing worked. Blackford remained unproductive. A jury would be unable to find otherwise.

### CONCLUSION

Battelle is entitled to summary judgment. Insofar as the statutory retaliation claim is concerned, a jury would be unable to find either that Blackford opposed arguable acts of discrimination, or that Blackford's participation in protected conduct was a significant factor in Heister's decision to recommend discharge or Work's decision to accept Heister's recommendation. Insofar as the tort claim is concerned, it is questionable whether Blackford has identified a clear public policy. However, if he has, a jury would be unable to find that Blackford's participation in protected conduct caused his discharge. Finally, insofar as both claims are concerned, a jury would be unable to find that Battelle's explanation of its decision to discharge Blackford was a pretext for discrimination.

**IT IS HEREBY ORDERED:**

1. The defendant's motion for summary judgment (ct.rec.12) is granted. The plaintiff's claims are dismissed with prejudice.

2. All other pending motions are denied as moot.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order and furnish copies to counsel.