88 P.3d 966 (2004)
Steven M. KORSLUND, Virginia A. Miller, John Acosta, Appellants,
v.
DYNCORP TRI-CITIES SERVICES, INC., a Washington corporation, Fluor Daniel Hanford, Inc., a Washington corporation, Respondents.
No. 21603-9-III.
Court of Appeals of Washington, Division 3, Panel Four.
April 22, 2004.
*969 Victoria L. Vreeland, Gordon, Thomas, Honeywell, Malanca, Peterson, Seattle, WA, for Appellants.
Larry E. Halvorson, Michael B. Saunders, Halvorson & Saunders PLLC, Seattle, WA, for Respondents.
Jeffrey L. Needle, Susan B. Mindenbergs, Seattle, WA, for Amicus Curiae. *967
*968 KATO, C.J.
Steven M. Korslund, Virginia A. Miller, and John Acosta appeal the dismissal of their claims against DynCorp Tri-Cities Services, Inc., (DynCorp) and Fluor Daniel Hanford, Inc. (Fluor), arising from their allegations of safety violations, mismanagement, and fraud at the Hanford Nuclear Reservation. Mr. Korslund and Ms. Miller contend they were constructively discharged in violation of public policy. All three plaintiffs contend that, even if they were not constructively discharged, they have presented a valid claim for wrongful retaliation. They also contend they have presented facts to make out a claim for breach of promises of specific treatment in specific situations. Finally, if any of their claims are valid, they urge the court to apply Virginia law to permit punitive damages. We affirm in part, reverse in part, and remand.
In October 1996, Fluor became the prime Department of Energy contractor at Hanford, and DynCorp, its subcontractor, took over responsibility for the Fire Systems Maintenance (FSM) group. The plaintiffs were longtime workers in the FSM group. Ms. Miller and Mr. Acosta were journeyman electricians and longtime work partners. Mr. Korslund was the fire systems administrator and the lead engineer in the FSM group. Under DynCorp's management, Jon Finley was manager of the FSM group; his supervisor was Fire Chief Don Good, who in turn reported to Mike Dallas, DynCorp's director of operations.
Beginning in early 1997, Mr. Korslund participated in two investigations that were critical of DynCorp's safety practices. In his weekly reports to management beginning in March 1997, Mr. Korslund referred to safety violations and other work-related problems. He also reported to Mr. Good that some workers were abusing overtime. In August 1997, Mr. Korslund was asked to complete a revised conflict-of-interest questionnaire to reflect his personal relationship with Ms. Miller. DynCorp later rescinded the request.[1]
Also during the first half of 1997, Ms. Miller and Mr. Acosta became concerned about Mr. Finley's inexperience in the field, about what they believed were instances of mismanagement and fraud in the FSM group, and about abuse of work hours by FSM's pipefitters. On May 28, Mr. Acosta complained to Mr. Finley that a supervisor, Bill Blankingship, was supervising his own *970 wife in the FSM group; he also told Mr. Finley about abuses of overtime.
On July 18, when Mr. Korslund and Ms. Miller arrived a few minutes late for work, Mr. Finley confronted them about it, and Ms. Miller responded that she would try to arrive on time if Mr. Finley would address work-time issues with others in the group. Within the next few days, Ms. Miller submitted a series of four anonymous memos or notices of employee concern, alleging Mr. Finley used government vehicles for personal business, Mr. Blankingship improperly gave tools to friends with Mr. Finley's approval, improper work for another company, and safety violations by Mr. Finley. A fifth anonymous notice, in which Ms. Miller misrepresented herself as an employee in another department who worked 12-hour shifts, complained that employees on 10-hour shifts were unfairly favored. Also on July 18, Mr. Acosta submitted an anonymous notice of employee concern complaining of favoritism and nepotism and alleging one employee was abusing prescription drugs.
On July 25, Mr. Finley appointed Mike Ferry as electrical team lead, replacing Mr. Blankingship. Apparently as part of the change, Mr. Korslund was removed as lead engineer. He viewed this as a demotion, although his work hours and pay grade did not change.
Also on July 25, Mr. Finley wrote in his journal that he had met with Fire Chief Good and DynCorp and Fluor employee relations representatives about his confrontation with Ms. Miller. He wrote that the group concluded he should (1) discipline Ms. Miller for insubordination and threats; (2) develop a list of Ms. Miller's issues and resolve them immediately; (3) obtain information on Ms. Miller's "past incidents by contacting previous HR's"; and (4) set up a meeting with Mr. Dallas, DynCorp President Robert S. Frix, "lawyers and even [C]ongress to appraise [sic] them of the situation." Clerk's Papers (CP) at 2461.
At a meeting with Mr. Good, Mr. Acosta, and a Fluor employee relations representative on August 1, Ms. Miller reported she was being harassed by other workers because she had raised concerns about work-hours abuses. Ms. Miller also reported Mr. Finley had taken a government vehicle home during work hours and, along with Mr. Blankingship, had failed to report an accident involving an FSM vehicle. Mr. Good followed up with Mr. Finley and Mr. Blankingship about these allegations. Apparently in response to one of Ms. Miller's anonymous notices of employee concern, Mr. Finley on August 4 issued a memo outlining his expectations about workers' starting times, breaks, and quitting times. Ms. Miller alleges other employees were upset at her for raising the issue, and she was ostracized, threatened, and harassed by the FSM group's pipefitters. Mr. Acosta witnessed some of this treatment, directed both at him and Ms. Miller. Ms. Miller alleges she told a supervisor, Mr. Blankingship, about the harassment, but nothing changed.
On August 6, Mr. Finley wrote in his journal that he had met with Mr. Dallas and Mr. Frix. He wrote:
Mike [Dallas] said he was not going to meet with Miller. Wanted to meet with entire FSM group and provide clear directions and expectations from him. Bob Frix supports the efforts and said he was aware of issues. Mike wants me to schedule a conference room, schedule the times and have all the people there. Wants me to schedule Don Good or Bill Hayes. He said after the meeting he was going to conduct interviews and meet with some known issue people and provide them with complete management expectations and warn them to change their behavior or get out. He specifically stated to me that after he does this, that I had better manage with authority and provide leadership or get out.
CP at 2305-06. Mr. Dallas met with the FSM group on August 11. He told the workers about the importance of trust, teamwork, and cooperation, and he said the company planned to engage in team-building. After the meeting, an employee relations representative interviewed Ms. Miller and Mr. Acosta.
On August 14, Ms. Miller and Mr. Acosta were told to move their equipment from a Suburban vehicle they had used for years *971 and to begin using a van instead. The Suburban was considered a nicer vehicle, and Ms. Miller and Mr. Acosta believed Mr. Finley wanted it for his own use. In addition, the van had to be cleaned up before it could be used. Ms. Miller and Mr. Acosta viewed the change as harassment or retaliation, and they complained to the employee relations representative. She told them to transfer the tools as time permitted. Mr. Finley later had pictures taken of the Suburban, apparently to show that it had safety problems.
Ms. Miller and Mr. Acosta began working in their spare time to clean up the van so they could move their equipment from the Suburban. Mr. Ferry asked them on September 3 to move their equipment into the van if they had a chance, but they still did not complete the move, even though they had six free hours the next day. On September 5, Mr. Finley had a "very heated discussion" with Ms. Miller and Mr. Acosta about their failure to complete the transfer. CP at 1137. When Ms. Miller and Mr. Acosta told Mr. Finley they had not had time, Mr. Finley accused them of being insubordinate by refusing to do a job.
On September 10, Mr. Finley issued written warnings to Ms. Miller and Mr. Acosta for "extremely serious conduct" and insubordination for failing to move their equipment to and begin using the van. CP at 719, 1094. Both workers filed grievances over the warnings, claiming the incident had been blown out of proportion.
On September 28 or 29, Mr. Finley met with Ms. Miller, Mr. Ferry, and a union steward and informed Ms. Miller she would have to start her shift at 7:30 a.m. rather than 8 a.m. Ms. Miller contends the later starting time was necessary because she has a special-needs child, and Mr. Finley was aware of this. She did not object to the change at the time, she contends, because others were present during the meeting.
Meanwhile, on September 2, Mr. Finley presented to Mr. Korslund a draft of a performance evaluation. Mr. Korslund objected to several portions of the evaluation as inflammatory, and Mr. Finley made changes. Based on the revised evaluation, Mr. Korslund later received a 4.4 percent salary increase.
As part of the initiative announced on August 11, Mr. Dallas met with Mr. Korslund on September 17. Mr. Korslund told Mr. Dallas about overtime abuses and incidents of theft or bribery in the FSM group. After the meeting, Mr. Korslund sent to Mr. Dallas a 15-page memo, in which he raised dozens of concerns regarding safety or unethical practices. In response, Mr. Frix appointed Don Hay to investigate the allegations, under the direction of DynCorp's legal counsel. Mr. Korslund met extensively with and provided supporting documents to Mr. Hay, and he believed Mr. Hay took the allegations seriously and intended to conduct an accurate investigation. Mr. Hay also interviewed numerous DynCorp employees as part of his investigation. He identified 29 discrete allegations, several of which he concluded were based on perceptions and did not warrant investigation.
Before Mr. Hay completed his investigation, Mr. Korslund submitted an annual business conduct questionnaire to DynCorp's corporate headquarters in Virginia, attaching a separate memo in which he alleged thievery and improper overtime in the FSM group, and harassment for reporting the abuses. Mr. Hay also was assigned to investigate these additional allegations.
Mr. Hay submitted a report on Mr. Korslund's initial 29 allegations to DynCorp's legal counsel, David S. Broussard, on October 14. He completed his investigation on the additional allegations and submitted a report on November 13. Mr. Broussard then compiled a final report based on Mr. Hay's findings, in addition to information gathered from Mr. Good, Mr. Finley, and DynCorp's human relations office.[2]
On November 14, Mr. Korslund was called to a meeting with Mr. Dallas, Mr. Broussard, and Mr. Hay to discuss the report. Mr. Hay read the findings to Mr. Korslund, but he *972 was not given a copy. Mr. Korslund contends he was not allowed to dispute or elaborate on the findings. He further alleges:
I was accused of all kinds of misconduct, was threatened with termination, was told I would have to reveal all the information I have given on the hotline and to the DynCorp corporate office or face termination. They brought up very old issues from as far back as 14 years accusing me of misconduct, which had long been resolved and unfounded. They accused me of a number of things, including of having a well documented murder list from years ago, of preferential treatment toward Virginia Miller, of forging a lock and tag document, and of lying. They used the words "fire" and "terminate" in threats to me and told me to quit if I would not support and trust management.
CP at 2656.
Mr. Korslund was told that the report would be finalized after he met with Mr. Hay regarding additional allegations against Mr. Korslund.[3] Mr. Hay met with Mr. Korslund on November 17 and sent his report to Mr. Broussard, who prepared a final report to be delivered to Mr. Korslund and his attorney.
Although Mr. Broussard told Mr. Korslund's attorney that DynCorp did not intend to fire him, there is evidence the company had planned to transfer him and Ms. Miller to other units within the company. Mr. Finley's notes state:
My assessment:
I cannot build a confident reliable team with individuals who are resisting change and who have loyalties elsewhere.
(1) It is evident to me that Mr. Korslund has a control problem. Due to past incidents, I feel he has hostilities toward me and specific others within the work place. He has made comments to others that lead me to believe he will never be dedicated to serving in this org. as long as he does not have specific control and or if I remain manager.
(2) VA Miller started her own war and stress and has caused a hostile work environment as I believe was directed to have me removed as manager. I believe there are people within the org. that will testify to that. All of these issues have appeared [sic] after I asked her to come to work on time. I made corrections to the group bassed [sic] on her remarks from that incident.
(3) Mr. Acosta is a devoted person to Miller and Korslund's purposes. His statement to our new planner/scheduler last Friday 10/31, asking her what side she was going to be on, clearly indicated a threat to her. I believe he should be removed from the organization as well.
CP at 2466-67.
On November 21, Ms. Miller was informed she was being transferred to Hanford's 300 Area, where she would receive the same wage rate and benefits. DynCorp officials contended the transfer was in Ms. Miller's best interest to resolve her concerns about working in a hostile environment and to give her a shorter drive to work; they also told her the transfer would have a "calming effect" on the FSM group. CP at 1185. However, Ms. Miller did not agree the transfer was in her interest because it would risk loss of her fire systems certification and because she would have relatively lower seniority in the high-seniority 300 Area shop.[4]
The plaintiffs contend the defendants' actions caused various physical and emotional effects on them. On October 17, Mr. Korslund's physical examination revealed high blood pressure, which he attributed to job stress. He later learned his electrocardiogram was abnormal. His doctor referred him to a psychologist and prescribed Prozac and ulcer medication. After the November 14 meeting with DynCorp officials, Mr. Korslund began having "symptoms of anxiety *973 and stress, problems sleeping and concentrating, worry and fear, [and] stomach and bowel problems." CP at 2656.
A psychologist noted at one point that Mr. Korslund was "showing a tremendous amount of anxiety and sense of panic" and that the stress appeared to be causing panic attacks. CP at 134. After a counseling session on November 19, 1997, the psychologist noted Mr. Korslund showed symptoms associated with post-traumatic stress disorder. The psychologist advised Mr. Korslund to take medical leave. Shortly after the session, the psychologist informed Mr. Finley that she was placing Mr. Korslund on disability because of stress.
It is undisputed that Mr. Korslund has not worked at DynCorp since that time. In March 1998, the psychologist concluded he did not have a long-term disability, but his symptoms would recur quickly if he returned to work in the current setting. She diagnosed him with an adjustment disorder with mixed emotional features. A medical doctor declined to approve his return to work and noted if the job-related stress was not resolved, Mr. Korslund may suffer long-term consequences.
In June 1998, Mr. Korslund stated in a job resume that he was stagnant in his career and that opportunities at Hanford were limited because of downsizing. In July, Mr. Korslund applied for unemployment benefits, contending he had been constructively discharged. DynCorp responded that Mr. Korslund was still employed but was on long-term disability. The Employment Security Department found that an insurer had denied long-term disability benefits, concluded Mr. Korslund "quit work with good cause," and awarded unemployment benefits. CP at 153. In September, Mr. Korslund notified DynCorp that he had accepted employment at another firm and requested the balance of his personal time bank and a rollover of his pension funds. DynCorp replaced Mr. Korslund in March 1999.
Ms. Miller reported to a doctor on September 12, 1997, that she was "under a lot of stress at work," which could exacerbate her gastrointestinal problems. CP at 226. On September 30, Ms. Miller visited a counselor at the Hanford Environmental Health Foundation (HEHF), who concluded she was experiencing an adjustment disorder related to problems with her son and her stressful work situation. The counselor later referred Ms. Miller to a psychologist, who noted in a letter that Ms. Miller was "very distressed and anxious" about the care for her child after her shift starting time had been changed. CP at 284. HEHF then told Mr. Finley that Ms. Miller's schedule should be returned to the 8 a.m. shift starting time for medical reasons. On October 24, Ms. Miller again visited the physician, complaining of personal stress affecting her stomach and bowel. The doctor concluded Ms. Miller was experiencing depression and prescribed Paxil. Ms. Miller saw the physician again in November, complaining of stress at work, heart palpitations, tightness in her chest, and anxiety attacks, and the physician prescribed Zoloft. The physician apparently placed Ms. Miller on medical disability. The physician also referred her to a psychiatrist, who treated Ms. Miller for more than a year and diagnosed her as suffering from depression and panic disorder with agoraphobia, which were exacerbated by work stress.
It is undisputed that Ms. Miller has not worked at Hanford since November 1997. The psychiatrist noted in May 1998 that she had too many psychological and medical problems to return to work. In October 1998, the psychiatrist stated Ms. Miller still was unable to return to work. Ms. Miller has relocated with Mr. Korslund (whom she has married), and a new psychiatrist concluded in February 1999 that she continued to suffer from major depression. Another psychiatrist later noted Ms. Miller suffered from anxiety, poor concentration, distress, and "almost PTSD-like feelings." CP at 337. He diagnosed Ms. Miller with chronic post-traumatic stress disorder.
In October 2000, a Social Security administrative law judge found Ms. Miller suffered from depression and an anxiety disorder, was unable to work, and was disabled.
In October 1997, Mr. Acosta was having problems sleeping and concentrating, nightmares, volatile blood pressure, depression, *974 and feelings of moodiness and listlessness. On October 22, Mr. Acosta visited the HEHF counselor, who reported he had a "flat affect and slightly depressed mood." CP at 67. After Ms. Miller left the workplace, Mr. Acosta felt more isolated and ostracized by coworkers. He began to use his personal time to deal with these feelings and physical problems. Mr. Acosta saw his physician in November, but the doctor could find no medical reason for the symptoms and urged him to take antidepressant medications and to see a psychiatrist or psychologist. Mr. Acosta declined, believing he could deal with the problems himself. A psychologist who specializes in treating whistleblowers has concluded that his treatment at the workplace caused Mr. Acosta to be depressed, anxious, and tense, which in turn exacerbated various physical problems. The psychologist concluded Mr. Acosta
likely will have mistrust of management in all future positions, which will have a detrimental affect on his mental health. He will probably need ongoing medical care for the near future and his prognosis is guarded. He has a bleak outlook and is disenchanted with the management of DynCorp. He has a sense of impending doom and reports that he is having difficulty being happy and content. He cannot seem to forget about the environment and problems at work and the people there. If the reactions of his managers were supportive, then his stress levels would not be as great and fewer symptoms would occur.
CP at 1936. Mr. Acosta remains actively employed in the FSM group.
Mr. Korslund, Ms. Miller, and Mr. Acosta filed this action for damages in June 1998. Their complaint set forth five claims: (1) wrongful discharge and retaliation in violation of public policies; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) placing the plaintiffs in a false light; and (5) breach of promises of specific treatment in specific situations. The plaintiffs also sought punitive damages under choice of law principles pursuant to Virginia law. The court entered a stipulated order dismissing the second, third, and fourth claims, and it granted the defendants' motions for summary judgment on the remaining claims, as well as the request for punitive damages.
We first consider whether the court properly dismissed the plaintiffs' claims for wrongful discharge and retaliation. In reviewing a summary judgment order, the court engages in the same inquiry as did the superior court. Our Lady of Lourdes Hosp. v. Franklin County, 120 Wash.2d 439, 451, 842 P.2d 956 (1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The burden is on the moving party to establish its right to judgment as a matter of law, and facts and reasonable inferences from the facts are considered in favor of the nonmoving party. Our Lady of Lourdes, 120 Wash.2d at 452, 842 P.2d 956.
In Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984), the Supreme Court recognized the tort of wrongful discharge in contravention of a clear mandate of public policy:
We believe that this narrow public policy exception should be adopted because it properly balances the interest of both the employer and employee. The employee has the burden of proving his dismissal violates a clear mandate of public policy. Thus, to state a cause of action, the employee must plead and prove that a stated public policy, either legislatively or judicially recognized, may have been contravened. This protects against frivolous lawsuits and allows trial courts to weed out cases that do not involve any public policy principle. It also allows employers to make personnel decisions without fear of incurring civil liability. However, once the employee has demonstrated that his discharge may have been motivated by reasons that contravene a clear mandate of public policy, the burden shifts to the employer to prove that the dismissal was for reasons other than those alleged by the employee. Thus, employee job security is *975 protected against employer actions that contravene a clear public policy.
Id. at 232-33, 685 P.2d 1081.
This tort applies only when an employee has been discharged. Roberts v. Dudley, 140 Wash.2d 58, 76, 993 P.2d 901 (2000). The discharge may be either actual or constructive. Snyder v. Med. Serv. Corp., 145 Wash.2d 233, 238, 35 P.3d 1158 (2001).
Mr. Korslund and Ms. Miller[5] contend they were constructively discharged because intolerable working conditions forced them to leave their jobs. The superior court dismissed their claims because it concluded they had failed to prove they were discharged, either actually or constructively. The court apparently held that, to be considered discharged, the employee must actually resign from his or her position. See, e.g., Blomster v. Nordstrom, Inc., 103 Wash.App. 252, 258, 11 P.3d 883 (2000) (constructive discharge if reasonable person would be "forced to quit," the person "did quit," and person suffered damages by being "forced to quit"); Micone v. Town of Steilacoom Civil Serv. Comm'n, 44 Wash.App. 636, 643, 722 P.2d 1369 (constructive discharge if employer forces employee "to resign"), review denied, 107 Wash.2d 1010 (1986); Barrett v. Weyerhaeuser Co. Severance Pay Plan, 40 Wash.App. 630, 631, 700 P.2d 338 (1985) (constructive discharge when employer forces employee "`to quit his job'") (quoting J.P. Stevens & Co. v. Nat'l Labor Relations Bd., 461 F.2d 490, 494 (4th Cir.1972)).
The initial issue in this case, which apparently has not yet been addressed in Washington, is whether a person is required to "quit" or "resign" from a job in some formal way to be considered constructively discharged. The defendants point out that both Mr. Korslund and Ms. Miller continued to receive benefits for some time after they stopped actively working in November 1997. They also point out that Mr. Korslund and Ms. Miller were considered employees during their medical leaves. See 29 U.S.C. § 2614(a)(1) (employee who takes leave under Family and Medical Leave Act entitled to return to same or equivalent position); Valley Rock Prods., Inc. v. Nat'l Labor Relations Bd., 590 F.2d 300, 304 (9th Cir.1979) (under National Labor Relations Act, "[a] worker on a leave of absence continues to be regarded as an employee unless it is established by overt action or clear communication that the employment relationship has been terminated").
But the defendants' insistence on a technical resignation ignores the realities of the circumstances alleged here. The plaintiffs contend the defendants made their working conditions so intolerable that they were required to leave the workplace for medical reasons; they should not be denied compensation simply because they failed to "quit." A federal court has addressed this circumstance in the context of a claim for constructive discharge in violation of the Civil Rights Act, 42 U.S.C. § 2000e. See White v. Honeywell, Inc., 141 F.3d 1270 (8th Cir.1998). In Honeywell, 141 F.3d at 1278, the plaintiff appealed a trial court's jury instruction that required her to prove she "quit" her job. The plaintiff had not formally resigned from her job but had taken unpaid medical leave and eventually was awarded full disability benefits for major depression. Id. at 1273-74. On appeal, the court held the trial court had improperly required an actual "quit":
We must determine whether a situation where allegedly intolerable working conditions force an employee into an unpaid medical leave of absence from which she is allegedly unable to return is essentially the same as forcing an employee to "quit" for purposes of proving a constructive discharge claim. We conclude that it is sufficient and that the district court committed reversible error by not adjusting the language from our cases to fit the facts and issues tried.
....
We are not prepared to say that "quit" is the magic word in a constructive discharge instruction. A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively *976 intolerable working conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions. In either case, the employer has, through objectively intolerable conditions, forced the employee out of active service. We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to permanently "leave" the employment; the employee need not prove that she technically "quit" in every case.
Honeywell, 141 F.3d at 1279; see Llewellyn v. Celanese Corp., 693 F.Supp. 369, 381 (W.D.N.C.1988) (plaintiff did not quit but went on medical leave without pay).
Under this analysis, the focus is on whether the employee permanently left the job, not on whether he or she technically resigned. Here, Mr. Korslund has presented facts demonstrating that he permanently left his job. Specifically, he received his full salary (in the form of short-term disability benefits and salary continuance compensation) only until February 1998 and disability payments only until June 1998. After that, like the plaintiff in Honeywell, Mr. Korslund apparently was on unpaid medical leave, and he received unemployment benefits based on a finding he had "quit work with good cause."[6] CP at 153. Under these facts, a jury could find that Mr. Korslund permanently left his job. The superior court erred in concluding Mr. Korslund was not discharged.
Ms. Miller's circumstances are dramatically different. Like Mr. Korslund, she received her full salary until February 1998 and short-term disability benefits until May 1998. Since that time, Ms. Miller has received long-term disability benefits through Fluor's policy, which covers only active employees. She also continues to receive medical coverage under Fluor's employee plan, at employee premium rates.[7] In January 1999, Ms. Miller submitted a medical insurance enrollment form on which she identified her employer as Fluor. A collective bargaining agreement provides that Ms. Miller is eligible to return to work at Hanford when she is no longer disabled. Under these facts, a reasonable jury could not find that Ms. Miller permanently left her job. The court properly held Ms. Miller was not discharged.
Even though they were not discharged, Ms. Miller and Mr. Acosta ask the court to recognize their claim for wrongful retaliation in violation of public policy. They rely primarily on a concurring opinion in White v. State, 131 Wash.2d 1, 20-25, 929 P.2d 396 (1997) (Madsen, J., concurring). The seven-member majority in White, however, declined to recognize a claim for a wrongful transfer in violation of public policy. Id. at 18-20, 929 P.2d 396. The majority's decision was based in part on its concern "that recognizing a cause of action for wrongful disciplinary action less than discharge has the potential to expand and to generate frivolous claims." Id. at 19, 929 P.2d 396 (emphasis added). Subsequent cases similarly have limited the public policy tort. See Smith v. Bates Tech. Coll., 139 Wash.2d 793, 802, 991 P.2d 1135 (2000) (noting court in White "declined to extend the tort to include wrongful transfers and refused to subject each disciplinary decision of the employer to judicial scrutiny"); Pulcino v. Fed. Express Corp., 94 Wash.App. 413, 423-24, 972 P.2d 522 (1999) (quoting White, 131 Wash.2d at 19, 929 P.2d 396), aff'd, 141 Wash.2d 629, 9 P.3d 787 (2000). Although the plaintiffs and amicus curiae argue convincingly for recognition of a tort of wrongful retaliation in violation of public policy, the court is constrained by White.[8] The superior court properly granted *977 summary dismissal of Ms. Miller's and Mr. Acosta's claims.
Because Mr. Korslund presented facts from which a jury could find he permanently left his job, the court erred in dismissing his claim for wrongful dismissal on that ground. However, we may affirm the dismissal on any ground supported by the record. See Allstot v. Edwards, 116 Wash.App. 424, 430, 65 P.3d 696, review denied, 150 Wash.2d 1016, 79 P.3d 445 (2003). We thus must also consider whether Mr. Korslund has established a basis for finding the defendants discharged him in violation of public policy.
The defendants first contend Mr. Korslund failed to raise facts showing he was constructively discharged. A constructive discharge occurs when "an employer deliberately makes an employee's working conditions [so] intolerable" that a reasonable person would be compelled to leave. Bulaich v. AT & T Info. Sys., 113 Wash.2d 254, 258-59, 778 P.2d 1031 (1989); see Martini v. Boeing Co., 137 Wash.2d 357, 366 n. 3, 971 P.2d 45 (1999); Nielson v. AgriNorthwest, 95 Wash. App. 571, 578, 977 P.2d 613, review denied, 138 Wash.2d 1023, 989 P.2d 1137 (1999). The employee must show "a deliberate act of the employer creating the intolerable condition, without regard to the employer's mental state as to the resulting consequence." Bulaich, 113 Wash.2d at 261, 778 P.2d 1031. "The intolerable element may be shown by aggravated circumstances or a continuous pattern of discriminatory treatment." Haubry v. Snow, 106 Wash.App. 666, 677, 31 P.3d 1186 (2001). Whether conditions are objectively intolerable usually is a question of fact. Id.; Nielson, 95 Wash.App. at 578, 977 P.2d 613.
Mr. Korslund has presented facts from which a jury could find DynCorp's and Fluor's deliberate acts created an objectively intolerable condition. After reporting various safety and other concerns, he was removed as FSM's lead engineer, which he viewed as a demotion. After his reports provoked an investigation of alleged abuses, Mr. Korslund himself became the target of the investigation and, during a meeting with DynCorp's director of operations, was "accused of all kinds of misconduct [and] threatened with termination." CP at 2656. There also were plans to transfer him to another working unit. These are deliberate acts by the defendants that a jury could find were aggravated circumstances or a continuous pattern of treatment.[9] Mr. Korslund has presented sufficient evidence to avoid summary dismissal on the question of constructive discharge. See Haubry, 106 Wash.App. at 678, 31 P.3d 1186.
The defendants nevertheless contend Mr. Korslund has failed to present facts to support all of the elements of the tort of wrongful discharge in violation of public policy. To establish liability for the tort, a plaintiff must prove (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct would jeopardize the public policy (the jeopardy element); (3) that this conduct caused the discharge (the causation element); and (4) (if the employer presents evidence its conduct was justified) that the justification was invalid or pretextual (absence of justification element). Hubbard v. Spokane County, 146 Wash.2d 699, 707, 50 P.3d 602 (2002); see Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996). The tort generally is "recognized in four different situations: where an employee is fired (1) for refusing to *978 commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal right or privilege; and (4) in retaliation for reporting employer misconduct." Hubbard, 146 Wash.2d at 707-08, 50 P.3d 602.
What constitutes a clear mandate of public policy is a question of law. Dicomes v. State, 113 Wash.2d 612, 617, 782 P.2d 1002 (1989). To satisfy the clarity element, Mr. Korslund relies[10] on the federal Energy Reorganization Act, 88 Stat. 1233, which provides that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee ... notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954." 42 U.S.C. § 5851(a)(1)(A). Although the defendants argue this provision provides protection only to employees and not the public at large, the legislative history states it "is a key component of our system of assuring adequate protection of public health and safety from the inherent risks of nuclear power." H.R.Rep. No. 102-474(VIII), at 79 (1992), reprinted in 1992 U.S.C.C.A.N.1954, 2297.
The protection of the lives and property of citizens from the hazards of radioactive material is as important and fundamental as protecting them from crimes of violence, and by the enactment of the legislation cited, Congress has effectively declared a clearly mandated public policy to that effect.
Wheeler v. Caterpillar Tractor Co., 108 Ill.2d 502, 511, 485 N.E.2d 372, 377, 92 Ill.Dec. 561 (1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 187 (1986); see Norris v. Lumbermen's Mut. Cas. Co., 881 F.2d 1144, 1150 (1st Cir.1989).
The primary authority on which the defendants rely does not support their argument. In Blackford v. Battelle Mem'l Inst., 57 F.Supp.2d 1095, 1100-01 (E.D.Wash.1999), the federal district court held an amended federal regulation did not satisfy the clarity element. Blackford did not address § 5851. Nor is there any merit to the defendants' implied assertion that the mandate of public policy must arise solely from Washington law. Thompson, 102 Wash.2d at 234, 685 P.2d 1081, relied solely on the federal Foreign Corrupt Practices Act, 91 Stat. 1494, to satisfy the clarity element. Although the Supreme Court has signaled a reluctance to rely on federal law when it is not consistent with Washington law, Sedlacek v. Hillis, 145 Wash.2d 379, 390-93, 36 P.3d 1014 (2001), the defendants have not shown that § 5851 is inconsistent with Washington law. See RCW 70.98.010. Mr. Korslund has satisfied the clarity element.
Whether a plaintiff has satisfied the jeopardy element is a question of fact. Hubbard, 146 Wash.2d at 715, 50 P.3d 602; Ellis v. City of Seattle, 142 Wash.2d 450, 463, 13 P.3d 1065 (2000). When imminent harm is threatened, the jeopardy element "may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action." Ellis, 142 Wash.2d at 461, 13 P.3d 1065. In situations not involving imminent harm, the plaintiff may be required to prove an actual violation of the policy. Id.; see Bott v. Rockwell Int'l, 80 Wash.App. 326, 908 P.2d 909 (1996); Wlasiuk v. Whirlpool Corp., 81 Wash.App. 163, 914 P.2d 102, 932 P.2d 1266 (1996). Here, Mr. Korslund's weekly reports to management and his 15-page memo to Mr. Dallas raised several safety concerns. These concerns *979 allegedly involved risks of imminent harm, and Mr. Korslund allegedly believed the defendants' practices violated federal safety standards.
To satisfy the jeopardy element, a plaintiff must establish "`that other means for promoting the policy ... are inadequate.'" Gardner, 128 Wash.2d at 945, 913 P.2d 377 (quoting HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.14, at 77 (1991)); see Hubbard, 146 Wash.2d at 713, 50 P.3d 602. However, a statutory remedy does not bar a common law tort claim unless the statutory remedy is mandatory and exclusive.[11]Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wash.2d 46, 53-66, 821 P.2d 18 (1991); see Wilson v. City of Monroe, 88 Wash.App. 113, 121-27, 943 P.2d 1134 (1997), review denied, 134 Wash.2d 1028, 958 P.2d 318 (1998).
As the defendants point out, the ERA provides an administrative process for adjudicating whistleblower complaints. 42 U.S.C. § 5851(b); see Bricker v. Rockwell Int'l Corp., 22 F.3d 871, 874 (9th Cir.1993) (remedy includes "reinstatement with back pay, compensatory damages, and attorney's and expert witness fees incurred in prosecuting a complaint"), cert. denied, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). But this statutory remedy does not preempt common law tort claims for retaliation against whistleblowers. English v. Gen. Elec. Co., 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); see Norris, 881 F.2d at 1150 (statutory remedy "permissive not mandatory"). Because the ERA's administrative process is not mandatory and exclusive, Mr. Korslund's common law tort claim is permitted.
Whether a plaintiff has satisfied the causation element also is a question of fact. See Hubbard, 146 Wash.2d at 718, 50 P.3d 602; see also Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 177-79, 876 P.2d 435 (1994). To avoid summary judgment, a plaintiff must "present sufficient evidence of a nexus between his discharge and alleged public policy violations." Havens, 124 Wash.2d at 179, 876 P.2d 435. Mr. Korslund has presented facts that would permit a jury to find the defendants' retaliation caused his constructive discharge. He has satisfied the causation element.
Finally, the defendants contend Mr. Korslund has failed to establish the absence of justification element. They misperceive the burden of proof. Justification for a discharge is an affirmative defense. See Blinka v. Wash. State Bar Ass'n, 109 Wash.App. 575, 588-89, 36 P.3d 1094 (2001), review denied, 146 Wash.2d 1021, 52 P.3d 520 (2002). Once a plaintiff has "met the clarity element and a question of fact remains as to the jeopardy and causation elements, the burden does shift to the [defendant] to show an overriding justification for [the plaintiff's discharge]." Hubbard, 146 Wash.2d at 718, 50 P.3d 602. It thus is the defendants' burden to raise the question of justification. Because they have not done so, they have not shifted the burden back to Mr. Korslund to prove absence of justification.
The defendants have failed to demonstrate there is no genuine issue of material fact as to Mr. Korslund's claim that he was constructively discharged in violation of a clear mandate of public policy.
The superior court's order granting summary judgment should be reversed as to Mr. Korslund's claim. However, because Ms. Miller and Mr. Acosta have failed to establish they were constructively discharged, and because there is no valid claim in Washington for the public policy tort for actions other than discharge, their claims properly were dismissed.
We next consider whether the court properly dismissed the plaintiffs' claims for breach of promises of specific treatment in specific situations. In addition to the public policy tort, Thompson also recognized that employee policy documents may create enforceable obligations:
[I]f an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment *980 in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship. We believe that by his or her unilateral objective manifestation of intent, the employer creates an expectation, and thus an obligation of treatment in accord with those written promises. See Restatement (Second) of Contracts § 2 (1981) (promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding a commitment has been made).
It may be that employers will not always be bound by statements in employment manuals. They can specifically state in a conspicuous manner that nothing contained therein is intended to be part of the employment relationship and are simply general statements of company policy. Additionally, policy statements as written may not amount to promises of specific treatment and merely be general statements of company policy and, thus, not binding. Moreover, the employer may specifically reserve a right to modify those policies or write them in a manner that retains discretion to the employer.
Thompson, 102 Wash.2d at 230-31, 685 P.2d 1081. The elements of this contract-based claim are: (1) a promise of specific treatment in a specific situation; (2) justifiable reliance on the promise by the employee; and (3) a breach of the promise by the employer. Bulman v. Safeway, Inc., 144 Wash.2d 335, 340-41, 27 P.3d 1172 (2001). Whether the plaintiff has satisfied these elements is a question of fact for the jury. Burnside v. Simpson Paper Co., 123 Wash.2d 93, 104-05, 864 P.2d 937 (1994).
As a preliminary matter, the defendants contend the plaintiffs' complaint fails to state a valid contract-based claim under Thompson. First, they argue that the claim applies only when an employee has been actually discharged. As the plaintiffs point out, however, Washington courts have examined contract-based claims by plaintiffs who were not discharged. See Trimble v. Wash. State Univ., 140 Wash.2d 88, 91, 993 P.2d 259 (2000) (university professor denied tenure); Lawson v. Boeing Co., 58 Wash.App. 261, 263, 792 P.2d 545 (1990) (employee offered choice between demotion and termination, and chose demotion), review denied, 116 Wash.2d 1021, 811 P.2d 219 (1991). The defendants have not provided authority for their contention that the claim is limited to cases in which the plaintiffs were actually discharged.
Second, the defendants point out that damages for emotional distress are not recoverable in a contract-based claim. See Gaglidari v. Denny's Rests., Inc., 117 Wash.2d 426, 440-48, 815 P.2d 1362 (1991). They reason that, because the plaintiffs seek emotional damages, the claim is invalid. See C.L.D. v. Wal-Mart Stores, Inc., 79 F.Supp.2d 1080, 1087 (D.Minn.1999) (failure to seek recoverable damages justifies dismissal of claim). But the plaintiffs sought more than emotional damages for their contract-based claim; they also requested compensation for loss of earnings and benefits, diminished earning capacity, and medical expenses. The claim thus is not invalid on this ground.
Third, the defendants contend that because Ms. Miller and Mr. Acosta were covered by a collective bargaining agreement, they are not entitled to rely on the promises contained in separate company documents. Thompson stated:
[W]e hold that employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees. When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control *981 over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule.
However, absent specific contractual agreement to the contrary, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship.
Thompson, 102 Wash.2d at 229, 685 P.2d 1081 (emphasis added). The defendants rely on the first italicized portion of this quotation, taken out of context, to suggest a separate, written employment contract bars enforcement of promises contained in an employee manual or other document.[12] In context, it is clear the Supreme Court was addressing the classic at-will employment situation. The second italicized portion of the quotation makes it clear the court will give effect to an employer's promises contained in a policy manual if they are not in conflict with some other, specific contractual agreement. The defendants have not provided a basis for limiting the contract-based claim to pure at-will employment situations.
We now address the specific documents on which the plaintiffs rely. Fluor's Employee Concerns Program (ECP) "provides a way to assure appropriate attention and response to any concerns related to: Safety; Health; Security; Quality; Environmental Protection; Business Ethics; Compliance with laws and regulations; Fraud, abuse, or mismanagement; or Physical Working Conditions." CP at 2862. The document entitled "Resolving Employee Concerns" provides in pertinent part:
2.1 Managers
[Fluor] is committed to open, honest, two-way communications with all employees. [Fluor]'s open door policy encourages employees to bring unresolved issues or concerns to the attention of management at any level necessary. Every member of management and supervision has the responsibility to facilitate concern resolution through support and application of this and the open door policy.
Management must ensure that employees who raise concerns or who testify or otherwise participate in congressional investigations are not harassed, intimidated, or subject to any discriminatory or retaliatory actions. Any employee who engages in or condones any of these actions against another employee will be subject to appropriate corrective measures.
2.2 Employees
Employees are free to discuss any matter of concern at any time with their supervisor, managers, or Employee Concern Points-of-Contact (POCs) without recrimination or reprisal. Normally, employees should seek to resolve concerns first by working with immediate managers or the appropriate service or oversight organization. However, if an employee believes that normal management processes have not or will not resolve a concern or if an employee does not know how to deal with a concern, any of the resources below are available:
 Workforce Development/Diversity (employment discrimination or sexual harassment)
 Human Resources (all personnel issues)
 Grievance procedure (contract-related issues for bargaining unit employees, only)
 The ECP
CP at 2862-63 (emphasis added).
The plaintiffs contend this document specifically promises to take disciplinary action against any person who retaliates against employees for submitting concerns. The defendants point out that the company retains for itself the discretion to determine the appropriate corrective measures. "A supposed promise may be illusory if it is so indefinite it cannot be enforced or if its performance is optional or discretionary on the part of the promisor." Stewart v. Chevron Chem. Co., 111 Wash.2d 609, 613, 762 P.2d 1143 (1988). While it is true that the company *982 retains discretion to determine the appropriate sanction, its policy expressly states that some corrective measure will be taken. The policy does not use language suggesting discretion, such as "should," see Stewart, 111 Wash.2d at 613, 762 P.2d 1143, or "make every effort," see Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, 111 Wash.App. 690, 695, 45 P.3d 1127 (2002), rev'd on other grounds, 150 Wash.2d 237, 76 P.3d 248 (2003). The document uses the word "will," which indicates disciplinary action is mandatory. See McClintick v. Timber Prods. Mfrs., Inc., 105 Wash.App. 914, 922, 21 P.3d 328 (2001). There is at least a fact question whether Fluor intended a promise of specific action in specific situations.[13]
On the question of justifiable reliance, the defendants direct the court's attention to evidence that Ms. Miller and Mr. Acosta were only vaguely aware of the "Resolving Employee Concerns" document. See Hill v. J.C. Penney, Inc., 70 Wash.App. 225, 235, 852 P.2d 1111 ("Statements contained in a supervisor's manual providing for specific treatment are not enforceable if the employer did not distribute the manual to employees, the employee is not aware of the provisions, and the employee consequently does not rely on the provisions."), review denied, 122 Wash.2d 1023, 866 P.2d 39 (1993). All of the plaintiffs stated in declarations, however, that they were aware of the companies' policies from various sources, including the Hanford website, postings on bulletin boards, discussions with other workers, e-mail communications, and notices in the company newsletter. This evidence creates at least a factual question as to the plaintiffs' justifiable reliance on the "Resolving Employee Concerns" document.
The defendants also contend there was no justifiable reliance because there is no evidence the plaintiffs were induced "to remain on the job and not actively seek other employment." Thompson, 102 Wash.2d at 230, 685 P.2d 1081. But evidence of inducement is not an element of the claim. In context, the quoted language from Thompson makes it clear that justifiable reliance itself demonstrates the employee accepted the promise as a component of the employment relationship. For example, in Bulman, 144 Wash.2d at 354, 27 P.3d 1172, the court concluded that because the plaintiff had failed to establish that he was aware of the policies, he could not prove justifiable reliance and thus the policies were not an inducement to remain employed.
The plaintiffs' justifiable reliance here is bolstered by Fluor's requirement that employees face discharge if they fail to report legal or ethical violations. A document entitled "Legal and Ethical Conduct" provides in pertinent part:
2.8 Reporting Obligations
Employees who believe that [Fluor] standards of conduct, laws, or government regulations are not being met or observed are expected to report the circumstances to their supervisors or any level of management, or if circumstances dictate, to other internal resources such as the Employee Concerns Program, Human Resources, the legal department or others. Government resources include the DOE Employee Concerns Program, the Inspector General, the Government Accountability Office and others.
....
2.11 Violations
Violation of these rules by any employee may result in the employee's discharge. Civil charges against the employee may also be filed.
CP at 2811.
This mandatory reporting requirement, coupled with the document prohibiting retaliation, demonstrates an overall policy of encouraging reporting of violations, first by requiring reports and second by promising that reporters will not be subject to harassment or disciplinary action. The plaintiffs allege they were relying on this overall policy, *983 and they have established at least a factual question on justifiable reliance.
On the question of breach of the promise, the plaintiffs have presented circumstantial evidence that their supervisors either retaliated directly or encouraged others to do so when they raised workplace concerns. All of the plaintiffs were long-term employees in Hanford's FSM group, apparently without serious disciplinary incident. But shortly after they began submitting safety and other concerns, they were subjected to harassment by coworkers and disciplinary actions by their supervisors, including (in Mr. Korslund's case) being relieved of some responsibilities and accused of misconduct and (in Ms. Miller's and Mr. Acosta's cases) being transferred to another work area. This temporal proximity of events is circumstantial evidence of retaliation in violation of the ethic's booklet's promise. See Vasquez v. State, 94 Wash.App. 976, 985, 974 P.2d 348 ("Because employers rarely will reveal they are motivated by retaliation, plaintiffs ordinarily must resort to circumstantial evidence to demonstrate retaliatory purpose."), review denied, 138 Wash.2d 1019, 989 P.2d 1143 (1999); see also Little v. Windermere Relocation, Inc., 301 F.3d 958, 970 (9th Cir.2001) (close timing may create prima facie case of retaliation). There is at least a factual question on breach of the promises.
The plaintiffs also contend DynCorp made specific promises in its policy documents. In September 1996, DynCorp's parent corporation issued a policy statement, applicable to all subsidiaries,[14] entitled "PS330Business Ethics and Compliance with Laws and Regulations." CP at 3217. The policy required the company to provide written standards of business ethics and conduct, which each employee was required to read and acknowledge. The company subsequently adopted a booklet entitled "Ethics: Standards of Business Ethics and Conduct." CP at 3222. The booklet provides in pertinent part:
All employees of DynCorp, its divisions and its subsidiaries are required to fully comply with these Standards of Conduct. Employees are required to report violations of the Standards and assist the Company, when necessary, in investigating violations. All managers and supervisors are charged with the responsibility of supervising their employees in accordance with these Standards of Conduct.
Failure to comply with these Standards of Conduct will result in disciplinary actions that may include suspension, termination, referral for criminal prosecution and/or reimbursement to DynCorp for any losses or damages resulting from the violation. As with all matters involving disciplinary action, principles of fairness will apply. Any employee charged with a violation of these Standards will be afforded an opportunity to explain his or her actions before disciplinary action is taken.
Disciplinary action will be taken when:
 employees authorize or participate in actions which violate these Standards;
 an employee deliberately fails to report a violation or deliberately withholds relevant or material information concerning a violation of these Standards;
 a manager's or supervisor's actions reflect inadequate supervision or lack of diligence in connection with a violation of these Standards;
 any supervisor retaliates, directly or indirectly, or encourages others to retaliate against an employee who reports a violation of these Standards.
CP at 3234 (emphasis added).
With this booklet, DynCorp also has adopted an overall policy encouraging reporting of violations. The defendants argue this booklet, like the "Resolving Employee Concerns" document, is merely discretionary. However, like the policy, this booklet expressly promises disciplinary action "will be taken." CP at 3234. Disciplinary action is mandatory. There is at least a fact question whether DynCorp intended a promise of specific action in specific situations.
On the question of justifiable reliance, the defendants contend the ethics booklet was *984 not distributed to and did not apply to Ms. Miller or Mr. Acosta. See Hill, 70 Wash. App. at 235, 852 P.2d 1111. However, Ms. Miller and Mr. Acosta do not contend the ethics booklet applies to them directly; they contend it forbids retaliation by supervisors, and they relied on the promise of discipline for breach of this promise. The plaintiffs' declarations that they had knowledge of the defendants' policies from various sources create at least a factual question as to their justifiable reliance on the ethics booklet.
The defendants also point out that Mr. Korslund's 1996 signed application for employment with DynCorp stated: "I also understand and agree that any employment of me by the Company is terminable at will by either the Company or me, with or without notice and with or without cause...." CP at 2901. They contend Mr. Korslund could not justifiably have relied on the ethics booklet in light of this at-will employment disclaimer. In Grimes v. Allied Stores Corp., 53 Wash. App. 554, 768 P.2d 528, review denied, 112 Wash.2d 1025 (1989), the plaintiff signed an employment application providing her employment was terminable at-will. Ten years later, the employer adopted a policy manual, which the employee alleged contained specific promises modifying the at-will employment status. Grimes, 53 Wash.App. at 557, 768 P.2d 528. The court held: "Whether the terminable-at-will contract came before or after the policy manual, the effect of such a contract is to prevent the employee from justifiably relying on language in the policy manual which may be contrary to the contract." Id. However, the court continued:
Our holding should not be interpreted as meaning that policy manual provisions can never supersede a written terminable-at-will contract. The employer and employee are free to contractually modify their prior agreement. But, "requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties." Thompson, [102 Wash.2d] at 228, 685 P.2d 1081. [The plaintiff] has not offered any evidence to show that the parties intended to be contractually bound by the statements in the policy manual.
Id. at 557, 768 P.2d 528.
DynCorp distributed the ethics booklet to Mr. Korslund each year, and he was required annually to acknowledge his receipt and attend a training session. This evidence creates at least a question of fact regarding the parties' intent to modify the at-will employment status.
As with the "Resolving Employee Concerns" policy, the plaintiffs have presented circumstantial evidence that DynCorp retaliated against them and thus breached the promise contained in the ethics booklet.
Finally, Mr. Korslund alone relies on Fluor's document entitled "Administering Progressive Discipline." CP at 2814. The document requires managers to investigate alleged violations of the company's Standards of Conduct promptly and decide on "a response that is fair, consistent, timely, and appropriate for correcting the behavior." CP at 2814. Appropriate responses are verbal warning, written warning, or suspension or discharge. Apparently depending on the severity of the violation, disciplinary action may begin with any of these responses. The document's appendix A, entitled Standards of Conduct, categorizes activities as Extremely Serious Misconduct (which may result in immediate discharge), Serious Misconduct (which may result in a suspension or discharge for a second infraction), and Misconduct (which may result in a written warning or suspension or discharge for subsequent infractions).
This policy is similar to the progressive discipline procedure addressed in Drobny v. Boeing Co., 80 Wash.App. 97, 102, 907 P.2d 299 (1995), which provided for several levels of discipline but stated it was "not always necessary ... that the discipline process commence with a written warning or include every step." The court stated:
Where an employment manual requires that an employee receive at least one warning prior to being dismissed, courts have found a question of fact as to the existence of a promise of "progressive discipline." *985 See Burnside, 123 Wash.2d at 105 n. 8, 864 P.2d 937; Swanson v. Liquid Air Corp., 118 Wash.2d 512, 523-24, 826 P.2d 664 (1992). In Burnside, the manual stated that an employee could be immediately terminated for various transgressions "if previous warnings have been given and employee has had the opportunity to resign." Burnside, 123 Wash.2d at 105 n. 8, 864 P.2d 937. In Swanson, the manual stated a finite list of misconduct that would result in immediate termination, and went on to provide that "[i]n all other instances of misconduct, at least one warning, shall be given." Swanson, 118 Wash.2d at 524, 826 P.2d 664.
In contrast, where the employment manual gives the employer discretion in applying the discipline procedures, courts have held as a matter of law that the manual does not provide a promise of specific treatment in a specific circumstance. In Stewart v. Chevron Chem. Co., 111 Wash.2d 609, 613, 762 P.2d 1143 (1988), the employee manual suggested, regarding layoff decisions, that management "should" consider job performance and experience when making its decision. The court deemed this language merely advisory and, therefore, insufficient to imply a contract based on specific promises of treatment. Stewart, 111 Wash.2d at 614, 762 P.2d 1143; see also Hill v. J.C. Penney, Inc., 70 Wash.App. 225, 234-35, 852 P.2d 1111, (employee manual not explaining or promising any discharge procedures cannot form basis of implied contract), review denied, 122 Wash.2d 1023, 866 P.2d 39 (1993).
In Birge v. Fred Meyer, Inc., 73 Wash. App. 895, 872 P.2d 49, review denied, 124 Wash.2d 1020, 881 P.2d 253 (1994) the court examined a policy stating that certain violations, including dishonesty and other unspecified employment conduct which the company considered equally serious, would result in termination without warning, and that other types of conduct would result in disciplinary action, but usually in termination only after a prior warning. Birge, 73 Wash.App. at 897, 872 P.2d 49. Fred Meyer thereby reserved to itself the discretion to fire employees at will. Birge, 73 Wash.App. at 900, 872 P.2d 49. Because the company retained discretion, Birge could not establish any factual issues regarding the existence of a promise for specific treatment under specific circumstances, i.e., the requirement of a warning. Birge, 73 Wash.App. at 900, 872 P.2d 49.
Drobny, 80 Wash.App. at 103-04, 907 P.2d 299. The Drobny court held that because the employer retained the discretion to dismiss an employee without prior discipline, the policy was not an enforceable promise. Id. at 104, 907 P.2d 299.
Like the policy in Drobny, Fluor's progressive discipline policy permitted discipline to begin at any level, and dismissal for some misconduct was permitted without prior disciplinary action. The policy thus was not a promise of specific treatment in a specific situation.[15]
The superior court correctly dismissed Mr. Korslund's claim for breach of the progressive discipline policy. However, the court erred in dismissing the plaintiffs' claims that the defendants breached promises contained in the other documents.
Finally, we consider whether the court properly dismissed the plaintiffs' request for punitive damages against DynCorp under Virginia law. When parties dispute the application of different states' law, the initial issue is whether there is an actual conflict in the laws. Seizer v. Sessions, 132 Wash.2d 642, 648-49, 940 P.2d 261 (1997). Washington law bars punitive damage awards unless they are authorized by statute. Barr v. Interbay Citizens Bank, 96 Wash.2d 692, 697, 635 P.2d 441, 649 P.2d 827 (1981). Virginia law permits punitive damages in tort actions if the defendant's conduct was "`willful and wanton.'" Infant C. v. Boy Scouts of Am., Inc., 239 Va. 572, 580, 391 S.E.2d 322 (1990) (quoting Booth v. Robertson, 236 Va. *986 269, 273, 374 S.E.2d 1 (1988)). Thus, a court in Virginia arguably could award punitive damages in a tort claim for wrongful discharge in violation of public policy, if it concluded the defendants acted willfully and wantonly.
If an actual conflict exists, a court must determine which state has the "most significant relationship" to the particular issue. Johnson v. Spider Staging Corp., 87 Wash.2d 577, 580, 555 P.2d 997 (1976). In a tort case, Washington courts examine the following contacts to determine which state has the most significant relationship:
a) the place where the injury occurred,
b) the place where the conduct causing the injury occurred,
c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
d) the place where the relationship, if any, between the parties is centered.
RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971); see Johnson, 87 Wash.2d at 581, 555 P.2d 997.
Here, the conduct at issue and the alleged injuries occurred in Washington. At the time, all three plaintiffs were Washington residents. The defendants are incorporated in and have principal places of business in Washington. Most of the alleged conduct occurred in Washington. All of the contacts point to Washington as the state with the most significant relationship.
The plaintiffs nevertheless urge the court to apply Virginia law, which they contend will promote that state's interest in "deter[ring] and punish[ing] wrongdoers who are located within its borders." Opening Br. of Appellant Acosta at 29. They apparently refer to DynCorp's parent company, a Virginia corporation with headquarters in Virginia, which is not a party to this litigation. While common sense suggests a punitive award against a subsidiary will have a deterrent effect on a parent corporation, the plaintiffs have not provided any authority for their argument that Washington's interest in limiting punitive awards is less compelling than Virginia's alleged interest in such an indirect punishment.
The significant contacts overwhelmingly favor application of Washington's law. The superior court properly dismissed the plaintiffs' request for punitive damages.
We (1) affirm the order dismissing Ms. Miller's and Mr. Acosta's claims for constructive discharge in violation of a public policy; (2) reverse the order dismissing Mr. Korslund's claim for constructive discharge in violation of a public policy; (3) reverse the order dismissing the plaintiffs' claims for breach of promises of specific treatment in specific situations, except as to Mr. Korslund's claim for breach of the "Administering Progressive Discipline" policy; (4) affirm the order dismissing the plaintiffs' request for punitive damages under Virginia law; and (5) remand for resolution of the surviving claims.
WE CONCUR: SWEENEY and SCHULTHEIS, JJ.
NOTES
[1] Before DynCorp rescinded the request, Mr. Korslund had prepared an angry memo to DynCorp President Robert Frix, in which he refused to submit to what he viewed as an intrusion into his personal life and referred to theft and fraud at the Hanford site, safety violations, harassment and retaliation for reporting abuses, and nepotism favoring the Mormon Church, the Masonic Lodge, union members, and retired military members. Mr. Korslund did not send the memo to Mr. Frix.
[2] Apparently as a result of Mr. Hay's investigations and findings, DynCorp instituted some changes to its procedures.
[3] Mr. Korslund alleges that, while Mr. Hay's investigation was pending, he was directly or indirectly accused of various misconduct, such as possession of explosives, violation of Department of Transportation rules and safety regulations, and falsification or forgery of documents. The allegations apparently were unsubstantiated.
[4] The labor union filed a grievance over the transfer, but it later was withdrawn, apparently at Ms. Miller's request.
[5] It is undisputed that Mr. Acosta was not actually or constructively discharged. This portion of our analysis thus applies only to Mr. Korslund and Ms. Miller.
[6] The defendants repeatedly allege Mr. Korslund resigned to take another job in September 1998, apparently implying he remained employed until that time. However, his notice to DynCorp made no mention of resigning or quitting his job. It merely notified DynCorp that he had accepted other employment and requested payment of benefits that were owed to him.
[7] The plaintiffs argue that receipt of benefits cannot be conclusive in determining whether a person has permanently left his or her job. See, e.g., Honeywell, 141 F.3d at 1273-74 (plaintiff received full disability benefits). While receipt of benefits is not decisive, it should be a factor for the jury to consider.
[8] Amicus also relies on Robel v. Roundup Corp., 148 Wash.2d 35, 59 P.3d 611 (2002), in which an employee claimed she was harassed because she filed a workers' compensation claim, which was a violation of RCW 51.48.025(1). The issue in Robel was entirely statutory. It did not involve a claim for the common law tort of wrongful retaliation in violation of public policy. The dissenting opinion in Robel incorrectly contended the majority "extends the tort of wrongful discharge... to encompass an act by an employer short of actual or constructive discharge." Robel, 148 Wash.2d at 70, 59 P.3d 611 (Bridge, J., dissenting).
[9] The defendants also rely on the rule that a resignation is presumed to be voluntary. See Micone v. Town of Steilacoom Civil Serv. Comm'n, 44 Wash.App. 636, 642, 722 P.2d 1369, review denied, 107 Wash.2d 1010 (1986). Here, of course, there was no resignation. Even if there were, Mr. Korslund has presented ample evidence to rebut a presumption that he voluntarily left his job.
[10] The plaintiffs also contend public policy may be derived from "volumes of health and safety laws and regulations which apply to activities at [Hanford], as well as those specifically prohibiting waste, fraud, mismanagement and abuse of authority by [private] contractors." Opening Br. of Appellant Miller at 22. Aside from appending a list of statutes and regulations to Mr. Korslund's brief, the plaintiffs have not addressed these authorities specifically, and we need not consider them here. See Holland v. City of Tacoma, 90 Wash.App. 533, 538, 954 P.2d 290 ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."), review denied, 136 Wash.2d 1015, 966 P.2d 1278 (1998). The plaintiffs rely on Gardner, 128 Wash.2d at 944, 913 P.2d 377, which noted that a public policy protecting human life is derived from "countless statutes and judicial decisions." But in the next paragraph, the court in Gardner expressly addressed some of those authorities. Gardner did not hold that a plaintiff may merely provide a list of statutes and regulations as proof of a clear mandate of public policy.
[11] The defendants rely on Johnson v. Honda of Am. Mfg., Inc., 221 F.Supp.2d 853, 856 (S.D.Ohio 2002), which held a common law tort claim is not necessary if there is an alternative statutory remedy available. Johnson conflicts with Washington law on this point.
[12] The defendants cite two cases in which the courts held promissory estoppel does not apply when there is an express written agreement. See Barnhart v. New York Life Ins. Co., 141 F.3d 1310 (9th Cir.1998); Tradewell Group, Inc. v. Mavis, 71 Wash.App. 120, 857 P.2d 1053 (1993). These cases did not involve claims for breach of specific promises in employee manuals.
[13] The defendants also contend the promise is illusory because it simply requires compliance with the law. See Francom v. Costco Wholesale Corp., 98 Wash.App. 845, 867-68, 991 P.2d 1182, review denied, 141 Wash.2d 1017, 10 P.3d 1071 (2000). They have not identified what law the policy is purported to enforce. It thus is impossible to evaluate this argument.
[14] The defendants argue vaguely that any promises made were from DynCorp's parent corporation, which is not a party to this litigation. However, the documents expressly make their provisions applicable to subsidiaries and their employees.
[15] Mr. Korslund points out that the policy requires the company to conduct an investigation and to consider various factors in deciding on an appropriate sanction. Even assuming these activities were nondiscretionary, however, Mr. Korslund has failed to present evidence that the defendants breached those promises. In fact, it is undisputed that DynCorp's legal counsel appointed Mr. Hay to investigate the allegations against Mr. Korslund.